Howard N. Wollitz, SBN 58674
Allan J. Favish, SBN 99651
CHARLSTON, REVICH & WOLLITZ LLP
1925 Century Park East, Suite 1250
Los Angeles, California 90067
(310) 551-7000 • Fax:  (310) 203-9321
hwollitz@crwllp.com, afavish@crwllp.com

Attorneys for Plaintiff,
GEMINI INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEMINI INSURANCE COMPANY, a corporation,<br><br>          Plaintiff,<br><br>     vs.<br><br>WESTERN MARINE INSURANCE SERVICES CORPORATION, a California Corporation,<br><br>          Defendant. | Case No.<br><br>**COMPLAINT FOR:**<br><br>**1. BREACH OF CONTRACT**<br>**2. NEGLIGENCE** |

Gemini Insurance Company ("Gemini") alleges as follows:

## JURISDICTION AND VENUE

1.     This Court has original jurisdiction under 28 U.S.C. § 1332, in that there is complete diversity between the parties and the matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

2.     This Court is an appropriate venue under 28 U.S.C. § 1391(a) because the events and omissions giving rise to the claim occurred in this district in Stockton, California, and defendant Western Marine Insurance Services Corporation ("Westmar") resides in this district.

3.     Gemini is a corporation incorporated under the laws of Delaware having its principal place of business in Connecticut.

4.    Westmar is a corporation incorporated under the laws of California with its principal place of business in Stockton, California.

## FACTUAL BACKGROUND

5.    Westmar is an insurance brokerage specializing in marine insurance.

6.    Gemini is an insurer.

7.    Gemini and Westmar entered into a contract entitled "Program Administrator Agreement" ("PAA") effective July 1, 2004. *See* Exhibit 1, attached hereto. Among other things, under the PAA: a) Westmar was appointed as "Administrator to solicit, underwrite, bind, and issue" insurance policies sold by Gemini under Gemini's "AquaPac Plus Program," b) Westmar was required to "perform all acts necessary to the proper solicitation, placement, acceptance, and servicing of the policies including . . . to solicit, underwrite, quote, bind, rate, code, and store policies; and . . . to make endorsements, changes, and modifications to policies as authorized . . . ;" c) Westmar agreed to defend, indemnify and hold Gemini harmless from and against all claims, actions, causes of action, liability or loss which result from any real or alleged negligent or willful acts, errors or omissions of Westmar, or the servants, employees, representatives, producers, or brokers of Westmar in the performance or breach of duties under the PAA. *See* Exhibit 1, attached hereto.

8.    Westmar issued Gemini package insurance policy no. WGP0000073-00 to Wesco Sales Corporation ("Wesco") with a term of August 6, 2004, to August 6, 2005 ("2004-2005 policy"). The 2004-2005 policy included coverage for commercial property, including floating property such as piers, docks and slips, and for loss of business income from damage to such property. The 2004-2005 policy included blanket coverage for all insured locations.

9.    Westmar issued Gemini renewal package insurance policy no. WGP0000073-01 to Wesco with a term of August 6, 2005, to August 6, 2006 ("2005-2006 policy"). The 2005-2006 policy included coverage for commercial

1   property, including floating property such as piers, docks and slips, and for loss of
2   business income from damage to such property.  The 2005-2006 policy did not
3   include blanket coverage for all insured locations.  When the 2005-2006 policy
4   was issued, Westmar did not give any specific notice to Wesco that unlike the
5   2004-2005 policy, the 2005-2006 policy did not include blanket coverage for all
6   insured locations.

7       10.    Wesco's application for a renewal of the 2005-2006 policy was dated
8   May 16, 2006.  A question on the application stated: "Do you feel that operations,
9   housekeeping or other physical conditions present an unusual exposure?"  Wesco's
10  response to the question was "Yes."  However, Westmar never inquired further of
11  Wesco regarding that response.

12      11.    Westmar issued Gemini renewal package insurance policy no.
13  WGP0000073-02 to Wesco with a term of August 6, 2006, to August 6, 2007
14  ("2006-2007 policy").  The 2006-2007 policy included coverage for commercial
15  property, including floating property such as piers, docks and slips, and for loss of
16  business income from damage to such property.  The 2006-2007 policy did not
17  include blanket coverage for all insured locations.  When the 2006-2007 policy
18  was issued, Westmar did not give any specific notice to Wesco that unlike the
19  2004-2005 policy, the 2006-2007 policy did not include blanket coverage for all
20  insured locations.

21      12.    When Westmar issued the 2006-2007 policy, Westmar did not cause
22  the 2006-2007 policy to state that it provided coverage limits on a "per location"
23  basis.

24      13.    Wesco made a claim under the 2006-2007 policy to Gemini after
25  sustaining losses from damage to its docks, including loss of business income.

26      14.    Based on information and belief, Marine Claims Services, Inc.
27  ("MCS"), is a wholly owned subsidiary of Westmar that acted as a third party
28  administrator of claims for Westmar.

{00031486.DOC 1}                          3

15. Acting on behalf of Gemini under the PAA, Westmar advised MCS that Wesco's claim should be paid based on limits of the per location coverage rather than on the basis of blanket coverage for all insured locations.

16. Wesco filed an action against Gemini entitled *Wesco Sales Corporation v. Gemini Insurance Company, et al.*, case no. 56-2009-003368-22-CU-IC-VTA, Superior Court of California, County of Ventura (First Amended Complaint filed on or about February 20, 2009) ("Wesco Action"). The Wesco Action alleged that Gemini committed breach of contract and breach of the covenant of good faith and fair dealing by paying its claim based on limits of coverage per insured location rather than blanket coverage for all insured locations.

17. By letter dated May 7, 2009, attorney for Westmar Steven A. Kronenberg of Murphy Pearson Bradley & Feeney stated, in part: "Pursuant to Paragraph 8.2 of the Program Administrator Agreement, Western Marine Insurance Services, Inc., hereby agrees to indemnify, defend, and hold harmless . . . Gemini Insurance Company in the matter of <u>Wesco Sales v. Gemini Insurance Company and Berkley Insurance Company</u>, Ventura County Superior Court action no. 56-2009-003368-22-CU-IC-VTA." *See* Exhibit 2, attached hereto.

18. The Wesco Action settled with Gemini paying $950,000 towards the settlement.

19. Gemini paid amounts not less than $28,000 in attorney's fees to defend itself against the Wesco Action.

20. Westmar has not indemnified Gemini for the $950,000 settlement cost and the at least $28,000 attorney's fee cost that Gemini paid regarding the Wesco Action.

## FIRST CLAIM FOR BREACH OF CONTRACT

21. Paragraphs 1-20 are incorporated herein.

22. By failing to indemnify Gemini for the $950,000 settlement cost and the attorney's fee cost of not less than $28,000 that Gemini paid regarding the

1   Wesco Action, Westmar has breached the PAA.

2       23.   Gemini has suffered damages in the amounts of $950,000 and not less

3   than $28,000, for a total of at least $978,000.

4   **SECOND CLAIM FOR NEGLIGENCE**

5       24.   Paragraphs 1-20 are incorporated herein.

6       25.   Westmar had a duty to perform its obligations under the PAA without

7   committing negligence.

8       26.   Westmar negligently performed its duties under the PAA by failing to

9   give any specific notice to Wesco prior to issuing the 2005-2006 and 2006-2007

10   policies, that unlike the 2004-2005 policy, the 2005-2006 and 2006-2007 policies

11   did not include blanket coverage for all insured locations.

12       27.   Westmar negligently performed its duties under the PAA by failing to

13   inquire further of Wesco after Wesco answered affirmatively on its application for

14   a renewal of the 2005-2006 policy to the question: "Do you feel that operations,

15   housekeeping or other physical conditions present an unusual exposure?"

16       28.   Westmar negligently performed its duties under the PAA, when

17   Wesco made a claim under the 2006-2007 policy to Gemini, by advising its related

18   entity MCS that Wesco's claim shall be paid based on limits of coverage per

19   insured location rather than blanket coverage for all insured locations.

20       29.   Westmar's negligent conduct has caused Gemini to be damaged in the

21   amount of $978,000 ($950,000 for settlement and not less than $28,000 for defense

22   costs).

23   **PRAYER**

24   WHEREFORE, Gemini prays for judgment as follows:

25       1.   For damages in the amount of at least $978,000 ($950,000 for

26   settlement and not less than $28,000 for defense costs);

27       2.   For Gemini's costs of suit incurred herein;

28       3.   For prejudgment interest; and

1      4.     For any other relief that the Court deems just and proper.

CHARLSTON, REVICH & WOLLITZ LLP


By:_____/s/ Howard Wollitz_____
       HOWARD WOLLITZ
       ALLAN J. FAVISH
Attorneys for Plaintiff,
GEMINI INSURANCE COMPANY

# PROGRAM ADMINISTRATOR AGREEMENT

This Program Administrator Agreement (the "Agreement") is effective this First day of July 2004 (the "Effective Date"), by and between Berkley Underwriting Partners LLC (the "Company") and Western Marine Insurance Services, Inc. (the "Administrator").

WHEREAS, the insurance companies designated in Exhibit A are licensed, and/or authorized, insurance companies in various states of the United States; and

WHEREAS, Company is contracted as the Manager of the insurance companies designated in Exhibit A and therefore has express and implied authority to enter into this contract and perform such duties as required by this contract; and

WHEREAS, Administrator has substantial expertise in soliciting, developing, marketing, underwriting, and issuing contracts of insurance for certain coverages as described herein which uniquely meet the insurance needs of certain persons and entities; and

WHEREAS, Company desires to appoint Administrator to solicit, underwrite, bind, and issue such insurance coverages; and

NOW, THEREFORE, for good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## I.     APPOINTMENT/AUTHORITY

Subject to the limitations contained in this Agreement, Company hereby appoints Administrator as its Program Administrator for the purpose of underwriting, issuance, and delivery of policies or contracts of insurance and endorsements thereto as described in Exhibit A Underwriting Authority, attached hereto and incorporated by this reference, and any memoranda provided to Administrator from time to time, (individually a "policy" or collectively, the "policies"). Exhibit A may be modified by Company from time to time without the need to amend this Agreement and shall be effective upon five (5) days written notice to Administrator. Additionally, Company may, from time to time, provide Administrator with revised underwriting guidelines, procedures, instructions or memoranda setting out certain policies of Company with regard to the coverage or Policies written by Administrator which shall govern Administrator's conduct including, but not limited to, permitted coverage, character and quality of risk, reporting, policies issued, renewals, cancellations, collections or remittance of premiums and premium refunds, accounting, and record keeping. Administrator agrees to comply with and be bound by such revisions immediately without the need for amendment of this Agreement.

1.2     Subject to the limitations contained in this Agreement, Administrator shall perform all acts necessary to the proper solicitation, placement, acceptance, and servicing of the policies including:

    a.     to solicit, underwrite, quote, bind, rate, code, and store policies; and

    b.     to collect, receive, and account for premiums on policies; and

PAA-
Rev.4/5/04

1

EXHIBIT 1

7

c.     to number, issue, countersign, and deliver policies executed by authorized officers of Company; and

d.     to make endorsements, changes, and modifications to policies as authorized by Company; and

e.     to effect cancellation and non-renewal of policies. Such cancellation and non-renewal authority shall not, during the Term of this Agreement, be construed as authority to make general or indiscriminate cancellation, non-renewal, or replacement of the policies with those of another company, except upon specific written instructions from the Company or after notice to Administrator from Company; and

f.     to accept submissions from producers; however, Administrator shall have no authority to process appointments or terminations of appointments with state insurance departments on behalf of Company, unless Administrator receives prior written approval of Company; and

g.     to perform faithfully the duties set forth herein and to provide any other related activities or services incidental or necessary to the complete servicing of policies issued hereunder.

1.3     All policies shall have an effective date on or after 12:01 a.m. Central Standard Time on July 1, 2004.

1.4     All rate and form filings will be prepared by Administrator and submitted to Company for approval and filing. Unless Administrator receives prior written approval of Company to communicate directly with an insurance department, communication and correspondence with the various insurance departments relating to rate and form filings will be solely through Company. The parties will work together to promptly and adequately respond to any such correspondence. The Administrator shall not waive any condition or make any change to the Company's insurance policies, endorsements, or applications without the prior written consent of the Company.

1.5     Nothing contained herein shall create the relationship of employer and employee between Company and Administrator or between Administrator and any other representative of Company. Except as set forth herein, Company shall have no right of control over Administrator as to the time, means, or manner of Administrator's performance of its duties hereunder. Administrator shall conduct itself and its business under the terms of this Agreement solely as an independent contractor.

1.6     Administrator shall not employ jointly an individual who is employed by the Company.

1.7     Both Administrator and Company are aware that there are or may be laws or regulations in the various jurisdictions served by Administrator that may be interpreted to provide Administrator with certain rights of notice, "run-off", continuation of business written through Administrator, prevention of termination and regulatory review and possible disapproval of the termination of this Agreement. Because this Agreement has been mutually entered into for a special purpose, and places responsibilities, duties and obligations upon Administrator both beyond those and different from those of a normal soliciting producer, Administrator acknowledges that this, therefore, involves and necessitates a different relationship. Administrator hereby specifically waives any and all rights with respect to

PAA-
Rev.4/5/04                              Page 2 of 23

EXHIBIT 1

termination of this Agreement that may now and hereafter be provided Administrator by such statute or regulation in recognition of that different relationship, and agrees not to impose upon or require compliance by Company of any obligations relating to termination of this Agreement other than those provided for specifically in this Agreement.

## II.   TERM OF AGREEMENT

This Agreement begins on July 1, 2004, and will continue until terminated under the provisions of Section IX (hereinafter referred to as the "Term").

## III.   LIMITATIONS OF AUTHORITY

3.1   With respect to the policies which Administrator is now or may in the future be authorized to solicit, transact, quote, underwrite, rate, or bind under this Agreement, Administrator will not solicit, transact, quote, underwrite, rate, or bind policies on the following:

    a.   risks which are unacceptable in accordance with this Agreement, or the underwriting guidelines, procedures, instructions, or memoranda provided to Administrator by Company from time to time, or in excess of the authority limits, or in violation of any other limitations set out in Exhibit A; or

    b.   risks which are not in compliance with the applicable forms, rules, rates, or filings of Company according to their exact terms and to the laws and regulations in effect in the Territory.

3.2   In the event that Administrator solicits, transacts, quotes, underwrites, rates, or binds policies as prohibited by Section 3.1 above without the prior written approval of Company, whether intentional or not, Administrator will immediately do such things and take such actions as are necessary to remove or to minimize Company's exposure as an insurer on such unacceptable risks or such excess policy limits. Further, Administrator shall indemnify and hold the Company harmless for any and all payments that the Company may be required to make under policies which are prohibited by Section 3.1.

3.3   Administrator shall have no authority to arrange, purchase, or enter into any negotiations or agreements on behalf of Company to obtain reinsurance of any type with respect to the policies written by or through Administrator, shall have no authority to bind retrocessions on behalf of Company, and shall have no authority to commit Company to participate in insurance or reinsurance syndicates.

3.4   Administrator shall not act as an insurer for any insureds, and this Agreement shall not be construed as an insurance policy or any contract or agreement of indemnity of insureds.

3.5   Administrator may not offset any balance due from Company to Administrator against any amounts due from Administrator to Company under this Agreement, or under any other contract with Company or any other party.

3.6   Administrator shall not collect payment from a reinsurer or commit Company to a claim settlement with a reinsurer.

3.7   With regard to business which is the subject matter of this Agreement, Administrator may quote or bind accounts with other markets that do not qualify for the programs which are the subject manner of this agreement or which Administrator may choose not to quote or bind with the Company for underwriting reasons. Administrator further agrees that it will not,

PAA-
Rev.4/5/04                           Page 3 of 23

EXHIBIT 1

9

without prior written consent from Company, quote or bind any policy except a policy written by the Company for any insured when the expiring policy of the insured was written by the Company.

## IV. GENERAL OBLIGATIONS OF ADMINISTRATOR

4.1     Administrator represents and warrants that:

    a.    Administrator is fully licensed, qualified and authorized to act as insurance agency and producer, to perform its respective obligations hereunder, and is duly incorporated and in good standing under the laws of the States in which it does business, and Administrator will maintain such licenses, qualifications and/or authorizations for the period the Administrator is acting on behalf of the Company; and

    b.    Administrator has obtained all corporate authorizations as may be necessary to enable Administrator to enter and perform such commitments and obligations as it has hereunder; and

    c.    the full performance of any obligation hereunder by Administrator shall not constitute a breach or violation of any agreement and shall not be subject to any agreement limiting the full performance hereof, other than as contemplated herein.

4.2     Administrator shall maintain a listing and current copies of the insurance licenses of any sub-producer, or broker from which Administrator accepts a submission. Administrator shall supervise all producers who place business through Administrator. Further, Administrator shall be responsible to Company for such producers and for all funds, whether or not collected, for business solicited by such producers. At Company's request, Administrator shall allow Company to review, or provide copies to Company of the listing of and of any agreements with such producers. Administrator shall not permit its sub-producer or employed broker to serve on the Company's Board of Directors.

4.3     Administrator shall be responsible for full compliance with all applicable laws, regulations, rules, and requirements relating to the performance of its obligations hereunder; and the general standards, rules, and regulations of the insurance industry; and all written instructions provided to Administrator from time to time by Company.

4.4     On request, Administrator will forward to Company no later than five (5) days from such request exact copies of any policies or other appropriate evidences of insurance written, modified, or canceled pursuant to this Agreement; underwriting and financial documents or other reports written, produced, or received hereunder; policyholder data; or any other information in Administrator's possession requested by Company relating to the policies.

4.5     Administrator shall keep true and complete records of all transactions and correspondence with policyholders, producers, sub-producers, brokers, state insurance departments, reinsurers, and Company.

4.6     All records and documents required to be maintained by Administrator referred to herein including, but not limited to, policyholder information, underwriting files, financial documents, and records relating to Administrator's Premium Trust Account, shall be maintained during the Term of this Agreement and thereafter while providing any continuing services hereunder, in a manner and form as mutually agreed upon or as required by

PAA-
Rev.4/5/04                                   Page 4 of 23

EXHIBIT 1

Company to be compatible with Company's internal procedures and in accordance with generally accepted accounting principles and insurance regulatory practices. Such records shall be maintained for a period of no less than five (5) years (or such longer period as Company may request) after termination of this Agreement, and in such manner and form as may be required by Company's record retention guidelines. At the end of such five-(5) year period, Administrator shall provide Company with originals or copies of such records.

4.7   During the Term hereof, and notwithstanding termination hereof, such records and documents may be audited, examined, and copied by representatives of Company at any time, or its authorized representatives, during normal business hours and shall be made available for examination by Company, reinsurers, or any state insurance department or regulatory body which so requires.

4.8   Administrator shall provide Company with a monthly written report in the format prescribed by Company of all declaration(s) or policy (ies) spoiled, voided, or mutilated inadvertently hereunder. Administrator further agrees to return any such spoiled, voided, or mutilated declaration(s) or policy (ies) to Company with such report.

4.9   With regard to the policies written, Administrator shall provide, at its expense sufficient information to satisfy reporting requirements imposed on Company by boards, bureaus, and associations, including statistical reporting entities, and to enable Company and reinsurers to file required financial statements and reports with State Insurance Departments and regulatory bodies. Administrator will provide all required information no later than fifteen (15) business days prior to the mandated filing date. Company shall provide Administrator with such written and/or electronic reporting requirements. Furthermore, Administrator is responsible for all development cost of any and all extracts needed in connection with the Company's data systems. With the agreement of Administrator, Company may choose to authorize Administrator to act on its behalf in providing such information to, and/or corresponding with, any such requesting entity as described herein.

4.10   Administrator shall notify the Company within five (5) days of notice or receipt (or such shorter period as necessary to adequately respond) of any complaint with any state insurance department or other regulatory authority relating to the policies, whether against Company, Administrator, producers or brokers. Administrator shall provide Company with a proposed written response to a complaint and a copy of all documentation relating to such complaint including, but not limited to, a written summary of all facts relevant to such complaint. Company will then respond, or authorize Administrator to respond, to such complaint in such form as Company determines, in Company's sole discretion, necessary. The parties will work together to promptly and adequately respond to any such complaint in accordance with applicable insurance department requirements. If the Company so chooses, it may authorize Administrator to respond, directly to the insurance department, to any and all complaints received by the Administrator without the prior notification to Company or adherence to the procedures previously described in this Section. If such an authorization is granted, Administrator agrees to provide Company with a copy of each response at the same time Administrator's response is sent to the insurance department. Further, Administrator agrees to cooperate with Company in all such matters related to Section 4.10.

4.11   Except as specifically provided herein, Administrator shall have no authority to delegate any authority contained herein to brokers, producers, sub-producers, or to any other person or entity without the prior written authorization from Company.

4.12   Since Administrator and its employees are independent contractors and not employees of Company, all Administrator expenses including, but not limited to, Administrator's office

PAA-
Rev.4/5/04                                    Page 5 of 23

EXHIBIT 1                    11

rent; transportation; salaries; utilities; furniture; fixtures; equipment; telephone; attorney or other legal fees; postage; promotional advertising and public relations expenses; preparation and printing costs of proposals, premium notices, records, policy forms, endorsements, applications, and all other documents necessary for the performance of Administrator's obligations hereunder; reports; inspection fees; retail credit reports and any other documents required to fulfill the obligations of Administrator under this Agreement; commissions, fees, or countersignature fees due to producers, or brokers; and Administrator's license fees and occupational taxes, whether billed to Administrator or Company, shall be the sole liability of Administrator, unless assumption of such expense by Company is agreed to in writing by Company. Administrator will remit promptly to Company the amount of any such item billed to Company upon notice by Company to Administrator of the charge therefore.

4.13 Administrator shall not charge or commit Company to any expense, agreement, payment, debt, settlement, or obligation other than as expressly provided for herein.

4.14 Administrator may not use the name, logo, or service mark of Company or any of its affiliates in any advertising, promotional material, including electronic media, or in any material disseminated by Administrator without the prior written consent of Company. Administrator shall maintain copies and provide an original to Company of any advertisement or other materials approved by Company along with full details concerning where, when, and how it was used. Administrator shall be liable for any liability of or cost incurred by Company as a result of any such materials.

4.15 All supplies, including those containing Company name or logo, provided to Administrator or authorized to be used by Administrator by Company shall remain the property of Company and shall be returned immediately upon request. Upon termination of this Agreement or Administrator's authority hereunder, at Company's request, Administrator shall return all, or such property as Company may request, to Company or to its designated representative.

4.16 Administrator shall notify Company in writing:

a. fifteen (15) days prior to any change of ownership of ten percent (10%) or more of the outstanding stock of Administrator; or

b. fifteen (15) days prior to any change in control of Administrator or the owner of a controlling interest in Administrator not related to the transfer of shares of Administrator; or

c. within thirty (30) days of any change of any principal officer of Administrator.

4.17 If Company provides Administrator access to Company information or networks through computer access, Administrator shall be responsible for maintaining the security and integrity of such information and of Company's systems. Additionally, Administrator shall be responsible to ensure that Administrator's employees and representatives are aware of the sensitive and proprietary nature of the information obtained, of the importance of confidentiality, and of the conditions described in this Section 4.17.

4.18 Administrator agrees to furnish Company with a balance sheet, profit and loss statement and cash flow statement annually (or more often as requested by Company's Financial Officer). The statements will accurately reflect the financial condition of the Administrator, and the financial statements will include an auditor's statement and report if Administrator obtains audited statements. The audited financial statements shall be furnished to Company within

PAA-
Rev.4/5/04

Page 6 of 23

EXHIBIT 1

12

one hundred and twenty (120) days following the close of the fiscal year of Administrator, or sooner if available.

If Administrator does not obtain audited statements, the financial information furnished may be unaudited, unless submission of an audited statement is required by the law of any state having jurisdiction over this Agreement. Such unaudited financial statements shall be furnished to Company within ninety (90) days following the close of the fiscal year of Administrator or at any time as reasonably requested by the Company. If Administrator does not obtain audited financial statements, Administrator shall provide its most recently filed federal income tax return in addition to the unaudited financial statements.

## V.   PREMIUM REPORTING AND CASH REMITTANCES

5.1    Administrator shall be liable for and shall pay to Company all net written premium attributable to the policies produced hereunder, whether or not such premiums have been collected by Administrator. "Net written premium" as used herein and hereunder is defined as gross written premium of Company for the classes of business hereunder, less cancellations and return premiums and less commissions as defined in Article VI.

5.2    All sums collected by the Administrator on behalf of the Company are received in a fiduciary capacity and shall be directly deposited into a Premium Trust Account. The Premium Trust Account must be with a non-affiliated bank approved by Company's Financial Officer. Administrator agrees to furnish the Company with such information as the Company may require from time to time, including, but not limited to, the amount on deposit on behalf of the Company in any such account at any time, a list of checks drawn on any account involving the Company containing the names of the payee and the amounts and any other information requested by the Company.

The Premium Trust Account may be an interest-bearing account in a non-affiliated bank approved by Company in writing which meets the "Premium Trust Account Guidelines," a copy of which is set forth in Exhibit B attached hereto and incorporated herein by this reference and as modified from time to time by Company without the need for amending this Agreement, with interest payable to Administrator until such amounts are due to Company as set forth below.

Company shall have the absolute and unfettered right at all times to obtain information and statements from the bank regarding the Premium Trust Account. If this Agreement is terminated, Company shall have the right to appoint a substitute trustee for the Premium Trust Account or to direct the Bank to pay amounts in the Premium Trust Account to the Company or others.

Upon the issuance of a notice of termination of this Agreement, with or without cause, the Administrator's authority to make distributions from the Premium Trust Account shall be suspended. Thereafter, Administrator may withdraw moneys from the Premium Trust Account only with the express written consent of the Company.

Administrator shall be responsible for full compliance with all applicable laws, regulations, rules, and requirements regarding the Premium Trust Fund(s).

The keeping of an account with Administrator on Company's books, as a creditor or debtor account, is declared a record memorandum of the policies transacted; and the keeping of such account, an alteration in commission rate, a failure to endorse remittances promptly, or

PAA-
Rev.4/5/04

EXHIBIT 1

13

compromise, settlement, or declaration of the balance of the account shall not waive Company's right to assert the fiduciary nature of the premiums collected by Administrator.

5.3     Administrator shall provide Company with an itemized statement (the "Statement[s]") of money due to Company within fifteen (15) days from the end of the month. Such Statement shall include the names of all insureds, the applicable policy effective date, the applicable policy expiration date, the transaction effective date for each policy or endorsement issued, the type of policy, the state or states where the risk(s) is located, gross written premium amount, net written premium amount, premiums collected, Administrator's fee and such other information and in such format as Company may request from time to time. Administrator shall remit amounts based on net premium written for the month less Administrator's fee on net written premium, as reported in such statement to Company within forty-five (45) days from the last day of the month from which coverage is effective. Any dispute respecting such Statement(s) shall be resolved based on Company's records.

5.4     Administrator shall use diligence in collecting premiums from insureds.

5.5     Notwithstanding termination of this Agreement, Administrator shall refund to the policyholder or insured, as appropriate, or to Company if so directed by Company in writing, return premiums, at the same rate as provided in the applicable policy and commissions on return premiums at the same rate paid to Administrator.

5.6     Should Administrator default in any payment of premiums referred to herein, the entire collected portion of unpaid premiums on the policies shall be due and payable immediately.

5.7     If appropriate, Administrator agrees to be responsible for the collection and payment of any applicable surplus lines taxes and the filing of all affidavits as required by the appropriate surplus lines governmental entities and jurisdictions and shall provide Company with written evidence of such payment and compliance at any time as is reasonably requested by the Company.

5.8     The Company agrees to pay all federal, state and municipal taxes, licenses required by law, and fees or assessments of underwriting associations or pools of which the Company is required to be a member. Administrator shall be responsible for the collection of such funds, which by law are due from the insured, and payment to the Company via the remittance procedures described in Section 5.3 of this Agreement. Any such amounts not collected from the insured or paid to the Company, for which the Company is responsible for payment to regulatory authorities, shall be reimbursed by the Administrator to the Company.

## VI.     COMPENSATION OF ADMINISTRATOR

6.1     Subject to Administrator's compliance with the terms and conditions of this Agreement, Company shall pay Administrator a commission on gross premiums less cancellation and return premiums for all policies written and received pursuant to the Commission Schedule attached hereto as Exhibit C and incorporated herein by this reference.

6.2     The commission paid hereunder shall be full compensation for all services rendered by Administrator pursuant to this Agreement.

## VII.    GENERAL OBLIGATIONS OF COMPANY

7.1     Company shall cooperate with Administrator to appoint Administrator, any of Administrator's personnel and any of Administrator's producers or brokers, if so required and

PAA-
Rev.4/5/04                                    Page 8 of 23

EXHIBIT 1

14

at the request of the Administrator, in the Territory in which Administrator shall be soliciting and underwriting on behalf of Company. The Administrator shall bear the cost of all appointments.

7.2   Subject to the applicable laws and regulations of the Territory, and notwithstanding Section 1.2 (e) of this Agreement, Company shall have the right to modify, cancel, or refuse to renew any business written hereunder and same may be effected by Company requesting Administrator to modify any policy/certificate, or give notice of cancellation or non-renewal to the policyholder/certificate holder. Alternatively, or should Administrator not act within a reasonable time, Company may send such notice directly to the policyholder/certificate holder, in accordance with applicable law(s).

7.3   Company shall have the sole right to respond to any state insurance department complaint or inquiry, after consulting with Administrator as provided herein.

7.4   Company agrees that it shall not use Administrator's name, logo, or service mark in connection with any advertising without Administrator's prior written approval.

7.5   Company may combine or offset any balances or funds owed by Administrator to Company against any balances or funds owed to Administrator by Company under this Agreement or any other agreement between the parties.

## VIII.   INSURANCE AND INDEMNITY

8.1   Administrator is required to maintain in full force and effect the following policies issued by an insurer rated no less than "A-" by A.M. Best Company during the Term of this Agreement and thereafter while Administrator has any obligations hereunder:

a.   errors and omissions insurance covering Administrator and its employees in the minimum amount of Five Million dollars ($5,000,000); with a per claim or occurrence deductible or retention not to exceed Fifty Thousand dollars ($50,000); and

b.   fidelity insurance covering Administrator and its employees in the minimum amount of Two Hundred Fifty Thousand dollars ($250,000); or such greater amount or different terms as may be stipulated by the Company; and

c.   comprehensive general liability insurance (including personal injury) covering Administrator's employees in the minimum amount of One Million dollars ($1,000,000) single limit per occurrence covering Administrator and its employees; and

d.   automobile liability insurance covering Administrator's employees in the minimum amount of One Million dollars ($1,000,000) single limit per occurrence; and

e.   workers compensation insurance in at least the minimum amounts required to be maintained by Administrator by any applicable statute or regulation.

Such insurance shall be maintained by Administrator at its sole cost and expense and shall be primary and noncontributing coverage with regard to any valid and collectible insurance available to Company. Administrator shall request its insurers to provide thirty (30) days prior notification to Company, and Administrator agrees to immediately notify Company when it receives notice of lapse, increased deductibles, decreased coverage, or upon receipt of

PAA-
Rev.4/5/04

EXHIBIT 1                                                                15

a notice terminating coverage. Administrator shall furnish proof of such insurance to the Company prior to initiation of this Agreement. On or before May 1st of each year, Administrator shall provide proof of each renewal policy thereof. Administrator shall provide notification to the Company in the event of lapse of such coverage. Administrator further agrees to notify Company of any claim brought under any such policy whether or not such claim arises out of or is connected with the policies written hereunder.

8.2 At all times hereafter, Administrator agrees to defend, indemnify, and hold Company harmless from and against all claims, actions, causes of action, liability, or loss which result from any real or alleged negligent or willful acts, errors, or omissions of Administrator, or the servants, employees, representatives, producers, or brokers of Administrator in the performance or breach of duties under this Agreement, including but not limited to soliciting, quoting, underwriting, and/or binding policies prohibited under Section 3.1. Administrator further agrees that in the event Company is in violation of any state code, statute, regulation, or bulletin due to the negligent or willful acts, errors, or omissions of Administrator, or the servants, employees, representatives or producers of Administrator, then Administrator shall assume the responsibility and liability for such act and shall indemnify and hold Company harmless for such liability and loss. Loss shall include, but not be limited to, all damages, costs, expenses, reasonable attorneys' fees and other legal fees, penalties, fines, direct or consequential damages, assessments, verdicts (including punitive damages to the extent permissible by law), and any other expense or expenditure incurred by Company.

This Section 8.2 shall survive termination of this Agreement.

8.3 In all third party liability claims asserted against the Company, wherein the Administrator shall defend and indemnify the Company, the Administrator shall notify the Company within 24 hours of receipt of such claim. The Company shall have the right to retain counsel of its own selection, at the Administrator's expense, to provide a defense to the Company. The Company's written consent must be obtained prior to any settlement, which consent will not be unreasonably withheld. If Administrator, within a reasonable time after receiving notice of a claim from Company, fails to defend, Company shall have the right, but not the obligation, to undertake the defense, compromise, or settlement of such claim on behalf of, for the account of and at the risk of Administrator.

## IX. TERMINATION OF THIS AGREEMENT

9.1 This Agreement may be terminated with or without cause, upon 90 days prior written notice or as required by law. If this Agreement is terminated, with or without cause, Administrator's authority to place new policies or renew policies shall cease immediately upon receipt of the notice of termination or as required by law, unless Company advises Administrator that such right to place new or renewal policies continues until the effective date of termination or upon a date so designated by Company. The Company may suspend the underwriting authority of the Administrator during the pendency of a dispute regarding the cause for termination.

9.2 Termination by Company. Notwithstanding Section 9.1 above, Company may terminate this Agreement for cause, in whole or part, upon written notice to be effective immediately, unless otherwise indicated, which shall include, but is not limited to, the following:

    a.    Administrator, or its parent or any affiliated corporation becomes insolvent, institutes or acquiesces in the institution of any bankruptcy, financial reorganization, or liquidation proceeding or any such proceeding is instituted against Administrator or

PAA-
Rev.4/5/04

EXHIBIT 1

its parent corporation and remains undismissed for thirty (30) days (Administrator shall immediately notify Company of same); or

b. Administrator, or the owner of a controlling interest in Administrator, sells, exchanges, transfers, assigns, consolidates, pledges or causes to be sold, exchanged, transferred, assigned, consolidated, or pledged, all or substantially all of the stock or assets of Administrator, or any entity controlling Administrator, to a third party without the prior written consent of Company (Administrator shall immediately notify Company of same); or

c. Administrator fails to maintain a staff qualified to service the policies or to maintain the quality of services and obligations necessary to operate within this Agreement; or

d. Administrator fails to render timely and proper reports or premium accounting as required, or to remit premiums when due after ten (10) days written notice from Company; or

e. Administrator fails to maintain premium funds in the amount and manner required in this Agreement; or

f. Administrator engages in acts or omissions constituting abandonment, fraud, insolvency, misappropriation of funds, material misrepresentation, or gross and willful misconduct; or

g. Administrator's license or certificate of authority is canceled, suspended, or is declined renewal by any regulatory body within the Territory where Administrator transacts or services policies if, after ninety (90) days, Administrator fails to remedy such loss of license (Administrator shall immediately notify Company of same); or

h. If Administrator breaches this Agreement after written notice of such breach has been given to Administrator and Administrator has failed to cure within a five (5) day notice period; or

i. Administrator breaches the Claims Administration Agreement or fails to administer Claims in accordance with the Claims Administration Agreement or Company's guidelines, procedures, or instructions; in accordance with the applicable statutes, regulations, or bulletins of the Territory, or in accordance with the terms and conditions of the policies, after written notice of such breach has been given to Administrator and Administrator has failed to cure within a ten (10) day notice period; or

j. Administrator binds risks (i) that are unacceptable in accordance with the underwriting guidelines, procedures, instructions or memoranda provided for herein, or (ii) with limits in excess of those specified in the underwriting authority limits provided for herein, or (iii) with rates or policy forms or filings in a jurisdiction where Administrator has knowledge that required regulatory approvals have not been met; or

k. Administrator fails to permit Company to inspect or audit any records or files relating to the policies; or

l. Company determines that due to any initiative, referendum, judicial, legislative, or regulatory acts, the policies are not economically feasible; or

PAA-
Rev.4/5/04

EXHIBIT 1

m.    Company is unable to maintain reinsurance acceptable to Company; or

n.    Administrator fails to provide Company with evidence of insurance as required by Section 8.1 of this Agreement; or

o.    an order of suspension or revocation of Administrator's license by any insurance regulatory authority; or

p.    a conviction against Administrator or any of Administrator's executive officers of violation of the insurance laws or regulations of any jurisdiction or of any law constituting a felony in the jurisdiction in which committed, or of any law whose violation reflects adversely upon the honesty or integrity of Administrator or any of Administrator's executive officers whether or not classified as a felony; or

q.    the number of complaints received by Administrator relating to Administrator's performance and service to insureds, policyholders, sub-producers or members of the public is excessive, as may be determined by Company in its sole discretion.

9.3    <u>Termination by Administrator</u>.   Notwithstanding Section 9.1 above, upon written notice, Administrator may immediately, unless otherwise indicated, terminate this Agreement in whole or in part, for cause, which shall include, but is not limited to, the following:

a.    Company, or its parent or subsidiary or affiliated companies institute or acquiesce in the institution of any bankruptcy, financial reorganization or liquidation proceeding, or any such proceeding is instituted against Company and remains undismissed for thirty (30) days; or

b.    Company's license or certificate of authority is canceled or declined renewal by any regulatory body within the Territory where Company is issuing policies hereunder, if after ninety (90) days Company fails to remedy such loss of license.

9.4    <u>Continued Servicing</u>:   Administrator agrees that in the event this Agreement is terminated, then Administrator shall continue to perform all customary and necessary services regarding all policies previously issued by Administrator on behalf of Company in accordance with the provisions of this Agreement until all such policies have been completely canceled, non-renewed, or otherwise terminated; provided, however, that Company may, in its sole discretion, immediately suspend or terminate Administrator's continuing service obligation hereunder.

Administrator's continuing service obligations after termination of the Agreement shall include, but not be limited to:

a.    the issuance and countersignature of appropriate endorsements to policies when so authorized in writing by Company, provided that such endorsements shall not increase Company's liability, except as required by law, or extend the term of any policy without prior written approval of Company; and

b.    the issuance of all applicable cancellation and/or non-renewal notices in full and complete compliance with the insurance code(s) or regulations within the Territory where Administrator was authorized to write for Company and in accordance with any written instructions that may be issued by Company; and

PAA-
Rev.4/5/04

EXHIBIT 1

18

c.   the collection and remittance of all premiums due on the policies hereunder; and

d.   the full compliance with all applicable laws, regulations, rules, and requirements regarding any and all continuing service obligations the Administrator performs; and

e.   the reporting of sufficient information to satisfy any reporting requirements as addressed in Section 4.9 of this Agreement; and

f.   the maintenance, transmission to Company, and availability for inspection of all financial, claims, policy, and underwriting records as provided in this Agreement; and

g.   the obligations set out in Section 4 of this Agreement; and

h.   any other obligations necessary or appropriate to ensure the proper winding-up of the relationships created by this Agreement.

If Administrator fails in any respect to fulfill this continuing service obligation, then Administrator shall reimburse Company any expense incurred by Company to service or arrange for the servicing of the policies issued by or through Administrator hereunder or such amounts may be offset by Company.

9.5   As long as Administrator makes all payments hereunder and continues to be in compliance with all terms of this Agreement, Administrator may deal directly with all other licensed persons or entities with respect to the policies hereunder, including but not limited to, the right to collect from and to return premiums directly to all producers, brokers, or insureds. If Administrator has not made all payments hereunder or is not in compliance with the terms of this Agreement, upon Company providing written notice to Administrator hereunder, Company is authorized to deal directly with all other licensed persons or entities with respect to the policies hereunder, including but not limited to, the right to collect from and to return premiums directly to all producers, brokers, or insureds.

9.6   Notwithstanding anything else set forth herein to the contrary, if Administrator breaches this Agreement for any reason whatsoever, or fails to comply with any instructions or directions of Company, Company may immediately suspend some or all of the authority of Administrator under this Agreement. Additionally, Company may suspend the authority of Administrator during the pendency of any dispute regarding termination or suspension, and such suspension shall not be considered a default under the terms of this Agreement. Notice of such suspension may be by telephone, facsimile, first class mail, or other common method of communication and, upon receipt of such notice, Administrator shall thereupon cease to exercise such power or powers in accordance with such notice.

This Section 9.6 shall survive termination of this Agreement.

9.7   Ownership of Expirations:
a.   Records of insureds, policyholders and policies and their use and control for solicitation of business written or bound by or through Administrator ("Expirations"), as between Administrator and Company, shall be the sole and exclusive property of Administrator except:

1.   Underwriting records and files;
2.   The ownership, use and control of those policies that were submitted by other licensed producers shall be governed by the terms of the contracts between those

PAA-
Rev.4/5/04                         Page 13 of 23

EXHIBIT 1                                                    19

producers and Administrator, except to the extent that a.3. below becomes applicable.

3. If Administrator's authority under this Agreement is suspended or terminated in part or in full for a material breach of this Agreement, or Administrator fails to render all accounts due or pay any amounts due to Company except minor accounting differences, and Administrator fails to cure the breach on five (5) days notice from Company to Administrator, Company will be entitled to solicit, write and to sell insurance to any and all existing insureds or policyholders written by or through Administrator. The expirations will vest in and become the sole and exclusive property of Company.

4. If the Administrator's authority is suspended or terminated under this Agreement, and if any applicable insurance law or regulation prohibits Company from terminating any policies or obligates Company to continue or to renew, directly or through another producer of Company, any policies, or insured or policyholders previously bound or written under this Agreement, then Company shall be permitted and is hereby granted by Administrator a limited license in, and a right to use the expirations of those policies, insured and policyholders to permit Company to comply within its reasonable discretion and in good faith.

b. Upon the occurrence of any event which gives rise to the vesting of the ownership of expirations in Company, Company may take immediate possession of all records relating to those expirations and Administrator shall upon request immediately gather such records together at Administrator's principal place of business and allow Company access to take possession of those records. Company may service those expirations directly or dispose of them in any commercially reasonable manner. Company may collect premiums directly from any insured or policyholder who has not made payment to Administrator.

c. If, in disposing of Administrator's records and expirations, Company does not realize sufficient money to discharge in full any and all of Administrator's indebtedness to Company (including reasonable costs incurred by Company in connection with its recovery and disposal of the records and expirations), Administrator will remain liable to Company for the balance of the Administrator's indebtedness to Company. Administrator shall have no right to or interest in any commissions which may be generated as a result of Company's servicing those expirations.

d. If there is any excess over Administrator's indebtedness to Company (include any cost incurred by Company in connection with its recovery and disposal of records and expirations), realized by Company, it shall be remitted to Administrator.

This section 9.7 shall survive termination of this Agreement.

9.8 Company and Administrator hereby acknowledge and agree that this Agreement is a personal service contract between the parties and a request for financial accommodation by the Company for the benefit of the Administrator. This Agreement may not be assumed and/or assigned in a bankruptcy case under Title 11 of the United States Code or insolvency proceedings in any court having jurisdiction. Subject to 9.4 hereof, the Agreement shall automatically terminate without notice in the event that either party becomes insolvent, unable to meet debts as they mature, makes an assignment for the benefit of creditors, voluntarily or involuntarily enters liquidation, rehabilitation, bankruptcy, or receivership proceedings, liquidates or terminates its business activities.

X.  **GENERAL PROVISIONS**

PAA-
Rev.4/5/04                                    Page 14 of 23

EXHIBIT 1                                                                 20

10.1   Notice. Except as otherwise set forth herein, any notice required under this Agreement must be in writing and either sent by first class mail, facsimile, certified mail, or personally delivered. Notice shall be effective either upon receipt or five (5) days after mailing to the other party, whichever comes first. Unless changed, the addresses of the respective parties are:

Administrator: Porus F Austin CFO
Western Marine Insurance Services Corporation
4226 Coronado Avenue, Stockton, CA 95204 Ph# 209-466-1413 Fax 209-466-0260
Company:
Berkley Underwriting Partners LLC
215 Shuman Boulevard, Suite 200,
Naperville, IL 60563
Phone: 630-210-0360
Fax: 630-210-0376
Attn: John S. Diem, President

10.2   Integration, Waiver, and Amendment. This Agreement constitutes the entire agreement between Company and Administrator and supersedes any and all other agreements, either oral or written, between Company and Administrator with respect to the policies. No waiver by either party to enforce any provision of this Agreement will be effective unless made in writing and signed by an authorized officer of Company and Administrator and shall be effective as to the specifically stated waiver. No amendment to this Agreement will be effective unless made in writing and signed by the parties hereto, and specifying the effective date of such amendment.

10.3   Remedies Not Exclusive. No right or remedy set forth in this Agreement is exclusive of any other right or remedy but shall be in addition to every other right and remedy given under this Agreement or existing now or hereafter at law or equity.

10.4   Severability. Wherever possible, each provision of this Agreement will be interpreted in such a manner and to such an extent as to be effective and valid under applicable law. If any provision is prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity.

10.5   Applicable Law. This Agreement shall be interrupted, governed and enforced by and construed in accordance with the laws of the State of Illinois, without regard to its rules regarding conflict of laws.

10.6   Jurisdiction and Right of Action. Any dispute arising out of, under, or in connection with, the terms, conditions or enforcement of any of the provisions of this Agreement shall be submitted and litigated in Chicago, Illinois and Administrator hereby submits to the jurisdiction of the United States District Court for the Northern District of Illinois, Eastern Division or the Illinois State Court located in Chicago, Illinois, for purposes of the enforcement of the provisions of this Agreement.

The Administrator and the Company hereby agree to waive their right to jury trial for purposes of resolving any dispute arising out of, under, or in connection with this Agreement.

This Section 10.6 shall survive termination of this Agreement.

PAA-
Rev.4/5/04                                Page 15 of 23

EXHIBIT 1

21

10.7   Conformance to Law. This Agreement and the provisions relating to commissions shall, without prior notice, be automatically modified to conform with any law or governmental regulation having application to or jurisdiction over the subject matter of the parties hereto, and the parties shall promptly amend the Agreement to comply with such modifications.

Should any provision of this Agreement be declared or determined by any court to be illegal or invalid, the validity of the remaining part, terms or provisions shall not be affected thereby and said illegal or invalid part, term or provision shall be deemed not to be part of this Agreement.

10.8   Other Companies. Administrators agrees to advise Company and it is agreed that Company retains the right of first refusal as respects any existing and future insurance products for all lines of business written by Administrator. Company will provide a response to any notice provided under this provision within 30 days.

10.9   Non-Assignability/Non-Delegation. Administrator may neither delegate its duties nor assign its rights under this Agreement, unless otherwise agreed upon and authorized in writing by a Senior Vice President or more senior officer of Company.

10.10   Guarantee/Surety. If a Guarantor or Surety has agreed, by separate written instrument, to guarantee the obligations Administrator has assumed herein, any changes made by amendment of this Agreement or any Exhibits, Schedules, or Addendum(s) attached hereto relating to a class or classes of policies, Territory, commissions, reports, records, or accounting shall be deemed to be a contemplated change and not an alteration of the original obligation.

10.11   Confidentiality and Non-disclosure. Administrator agrees that all customer information disclosed by the Company to Administrator shall remain confidential and shall not be disclosed by Administrator to any individual, corporation, other business organization or governmental agency unless required by law or in conformity with the Company's Privacy Notice, and Administrator shall use such customer information only for the purpose for which the Company has provided such customer information to Administrator.

10.12   Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but which together shall constitute one and the same instruments.

10.13   Compliance with Law. Administrator shall comply with the requirements of all applicable federal, state and local laws, rules and regulations of all insurance regulatory authorities, including but not limited to the Violent Crime Control and Law Enforcement Act of 1994, OFAC and Title V of the Gramm Leach Bliley Act and any other state regulatory privacy provisions. Administrator agrees to adhere to and comply with the Company's Privacy Notice, which shall be provided to you from time to time.

## XI.   SALE OF ADMINISTRATOR

If at any time during the term of the Agreement, Administrator receives from any third party a bona fide offer to purchase Administrator, or any portion of Administrator's business, at a price and on terms acceptable to Administrator, Administrator shall give written notice of the offer to Company. Within Sixty (60) days after Administrator gives Company written notice of the third-party offer, Company, or W.R. Berkley Corporation, or any of its affiliates shall have the right to purchase Administrator or the portion of Administrator's business which is the subject of the third-party offer at the same price and on the same terms and conditions set forth in the third-party offer. In the event Company fails to exercise the option to purchase, Administrator may sell Administrator or the portion

PAA-
Rev.4/5/04                          Page 16 of 23

EXHIBIT 1

22

of the Administrator's business which is the subject of the third-party offer to the third party making the offer on the same terms and conditions set forth in that offer.

If for any reason Administrator or any portion of Administrator's business is not sold to the party making the offer, Administrator shall give Company the same right to purchase Administrator or any portion of Administrator's business upon receipt of any subsequent offer from any third party that is acceptable to Administrator.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed effective as of the date and year first above written.

**Administrator:**                          **Company:**

Western Marine Ins. Services Corp.     _Berkley Underwriting Partners_

Signed: _____     Signed: _____

Name: _Porus F Austin_____     Name: _John Diem_____

Title: _CFO_____     Title: _President_____

EXHIBIT 1                                    23

## EXHIBIT A

### UNDERWRITING AUTHORITY

A. Insurance Companies

StarNet Insurance Company – AquaPac Millennium Program
Gemini Insurance Company – AquaPac Plus Program

B. Territory
The Administrator's "Territory" shall be defined as follows:

CA, WA, OR, NV, CO, UT, MT, NV, AZ, & NM

C. Authorized Lines/Products

The Administrator's "Authorized Lines/Products" for this Agreement are as follows:

Inland Marine

D. Limits of Authority

Underwriting Authority is only granted to Ed Bordenave, Joe Cecchini and R. J. Lorenzi on business produced through approved producers.

The Administrator's maximum "Limits of Authority" to be written are as follows:

AquaPac Plus Program
The following limits would apply under this program:

**Casualty Exposure**
Total policy liability limits of up to $1,000,000/$2,000,000. The following coverages would be available under the program:

| | |
|---|---|
| CG: | $ 1,000,000 per occurrence |
| Employee Benefit Liability | $ 1,000,000 per occurrence |
| Fire Legal Liability | $ 1,000,000 per occurrence |
| Hired and non-owned automobile | $ 1,000,000 per occurrence |
| Products Liability | $ 1,000,000 per occurrence |
| Products Liability | $ 2,000,000 aggregate |
| Liquor Law Liability | $ 1,000,000 each common cause |
| Marinas / Marine Operators Legal Liability | $ 1,000,000 per loss, per accident or per occurrence |
| Hull Coverage | $ 1,000,000 per fleet (maximum $ 500,000 per boat) |
| Protections & Indemnity (includes Jones Act & towing Liability) | $ 1,000,000 per occurrence |
| Limited Pollution on Policies | $ 100,000 per occurrence |

PAA-
Rev.4/5/04                    Page 18 of 23

EXHIBIT 1

24

**Property Exposure**

The property limits available in the marina and boat dealers program would be up to $3,000,000 per location. The limit applies separately to both fixed and floating property (each can have up to $3,000,000 per location). Any limits above $3,000,000 would require fac reinsurance with a reinsurer acceptable to BUP.

AquaPac Millennium Program

The following coverages would be available under the program:

**Casualty Exposure**

| | |
|---|---|
| Protection and Indemnity including Longshoremen's And Harbor Workers Compensation* | $ 500,000 |
| Medical Payments | $ 10,000 |
| Under-insured Boats | $ 100,000 |
| Charterer Liability | $ 500,000 |

\* No coverage would be available for Jones Act

**Property Exposure**

| | |
|---|---|
| Hull & Machinery | $ 250,000 |
| Personal Effects | $ 50,000 |
| Trailer | Stated Amount |
| Commercial Towing | $ 1,000 |

E. Maximum Annual Premium Volume

The maximum premium volume to be written by Administrator for this Agreement on an annual basis is as follows:

F. Exclusions

The following is excluded from this Agreement and the policies written by Administrator under this Agreement:

G. Rating

Administrator shall only use the rates and underwriting rules approved by the Company and filed with the respective Insurance Department(s) for the Territory noted above, for the authorized lines, if so required.

H. Forms

Administrator shall only use the policy forms and endorsements approved by the Company and filed with the respective Insurance Department(s) for the Territory noted above, for the authorized lines, if so required.   Manuscripted endorsements may be filed and used only with the prior approval of Company and regulatory approval, if required.

PAA-
Rev.4/5/04

EXHIBIT 1

25

I.  Maximum Policy Period

The maximum policy period to be offered by Administrator is:  Fifteen (15) Months.

J.  Policy Cancellation Provisions

Administrator shall follow the policy cancellation provisions contained within those policy forms and endorsements approved by the Company and filed with the respective Insurance Department(s) for the Territory noted above, for the authorized lines, if so required, or as required otherwise by regulation.

K.  Deviations

Any deviations to the above items may be written by Administrator only with the prior written approval of Company.

PAA-
Rev.4/5/04                                    Page 20 of 23

EXHIBIT 1                                    26

## EXHIBIT B

## PREMIUM TRUST ACCOUNT GUIDELINES

The following guidelines have been established by Company for the selection of banks and the criteria for determining acceptable investments for maintenance of Company's Premium Trust Funds.

A. Banking Standards

The Company will approve all depository accounts based upon size and financial condition of the bank. The bank must also be a member of the Federal Deposit Insurance Corporation (FDIC).

B. Premium Trust Accounts

1. Premium Trust Funds must be maintained in a trustee bank account in an amount at least equal to the net written premiums (unpaid to Company), and return premiums (unpaid to policyholders or insureds) received by Administrator, net of Administrator's commissions.

2. Monthly copies of bank and investment statements for such bank accounts and/or depository (ies) shall be made available and sent to the attention of Company's designee upon request.

C. Maintenance of Fiduciary Funds

1. Administrator shall maintain such Premium Trust Funds at all times in a trustee bank account or depository separate from any other account of depository and as follows:

a. checking account, demand account, or savings account, each of which shall be designated as a trust account; or

b. in United States government bonds and treasury certificates or other obligations for which the full faith and credit of the United States are pledged for payment of principal and interest; or

c. in certificates of deposit of banks approved by Company and licensed by any state government within the United States or the United States government.

Notwithstanding the above, Company reserves the right to change the above Guidelines from time to time in his or her sole discretion.

These Guidelines shall survive termination of the Agreement.

PAA-
Rev.4/5/04                                    Page 21 of 23

EXHIBIT 1

27

## EXHIBIT C

## ALLOWANCES AND COMMISSIONS

Commission on both the AquaPac Plus and AquaPac Millennium programs:  Twenty-One (21%) Provisional and minimum Commission on Written Premium.

Profit Commission:  One (1%) percent increase in commission for each One (1%) decrease in Loss Ratio, beginning at a 55% Loss Ratio, sliding to a Commission of 25% at a 51% Loss Ratio.  If the actual loss ratio is below 51%, the maximum adjusted commission will be 25%.

Commission Adjustment:  Underwriting Year as used herein shall mean the period from June 1, 2004, through June 1, 2005, and each subsequent 12-month period shall be a separate Underwriting Year. For each Policy written under the terms of this Agreement, the Underwriting Year that any such Policy belongs to is based on the following:

1.  As respects all new Policies, the effective date of such Policies.
2.  As respects all renewal Policies that have a policy term of one year or less, the renewal date of such Policies,
3.  As respects renewal Policies that have a Policy term greater than one year, but not greater than 18 months, the renewal date of such Policies.

All premium and loss arising from Policies written under the terms of this agreement shall be allocated to the Underwriting Year of such Policy regardless of the calendar year such premium is earned or the date of any loss occurrence.

The above referenced loss ratio is calculated as follows:

      Deficit Carry forward, if any, from previous Underwriting Year
+    Paid losses
+    Paid allocated loss adjustment expenses
+    Outstanding losses
+    Outstanding allocated loss adjustment expenses
+    Incurred but not reported losses as calculated by Company actuary
=    Total reported Incurred
/    Earned Premiums

The first calculation for any adjustment period shall be made 24 months after the end of each Underwriting Year with adjustments made annually thereafter until all claims are settled.  The Commission calculation to include an unlimited deficit carry forward provision.

PAA-
Rev.4/5/04

EXHIBIT 1

28

**EXHIBIT D**

**ADMINISTRATOR CERTIFICATION**
**VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994**

Congress has passed the "Violent Crime Control and Law Enforcement Act of 1994" (the "Act"). This Act prevents anyone from engaging in the business of insurance if convicted of a criminal felony involving dishonesty or a breach of trust, unless the "individual" (as defined within the Act) receives the prior written consent of any insurance regulatory official with regulatory authority over the individual. Subject to the provisions of the Act, an insurer may be liable for willfully permitting a prohibited individual to engage in the business of insurance or to participate in such business.

As a result, Berkley Underwriting Partners is requiring the following questions to be answered. By signing this document, you acknowledge that the statements made are true, complete and correct in all respects and you understand that background checks may be obtained.

1.  Has the Administrator ever been convicted of a felony?  ___NO___  (yes or no)

2.  Has any officer, director or shareholder of the Administrator ever been convicted of a felony?  ___NO___  (yes or no)

3.  Has any individual person employed by the Administrator who will render services to the Company ever been convicted of a felony?  ___NO___  (yes or no)

4.  If you answered in the affirmative to any of the above questions, please explain:

_____
_____
_____
_____

I swear that the above information is true, complete and correct in all respects. I understand and acknowledge that the Administrator has an on-going obligation to disclose any criminal felony immediately to the Company. I also understand and agree that the Company may obtain a criminal background check and/or credit history on me or the Administrator at their discretion. I certify that I have the corporate power and authority to execute the foregoing.

IN WITNESS WHEREOF, I, _Porus Austin_____, execute this Certification this _23__ day of _June_____, _2004_.

Administrator:
Western Marine Ins. Services Corp.

Signed: _____
Title: CFO

PAA-
Rev.4/5/04                          Page 23 of 23

EXHIBIT 1

29

## EXHIBIT A

### UNDERWRITING AUTHORITY

A.  <u>Insurance Companies</u>

StarNet Insurance Company – AquaPac Millennium Program & Commercial Auto (AquaPac Plus Program – only)
Gemini Insurance Company – AquaPac Plus Program

B.  <u>Territory</u>

The Administrator's "Territory" shall be defined as follows:
CA, WA, OR, ID, CO, UT, MT, NV, AZ, & NM

The following additional states are available in the AquaPac plus Program:
AR, IL, IN, IA, KY, MI, MN, MO, OH, OK, TN, TX, WI

C.  <u>Authorized Lines/Products</u>

The Administrator's "Authorized Lines/Products" for this Agreement are as follows:

Commercial Property
Commercial General Liability
Commercial Auto
Inland Marine

D.  <u>Limits of Authority</u>

Underwriting Authority is only granted to Joe Cecchini and R.J. Lorenzi on business produced through approved producers.  Underwriting Authority is granted to Shelia Eskue for the AquaPac Plus program and to Sherri Garner and Kathy Kennedy for AquaPac Millennium Program.

The Administrator's maximum "Limits of Authority" to be written are as follows:

<u>AquaPac Plus Program</u>
The following limits would apply under this program:

**Casualty Exposure**
Total policy liability limits of up to $1,000,000/$2,000,000. The following coverages would be available under the program:

| | |
|---|---|
| CGL: | $1,000,000 per occurrence/$2,000,000 Gen. Agg |
| Employee Benefit Liability | $1,000,000 per occurrence |
| Fire Legal Liability | $1,000,000 per occurrence |
| Hired and non-owned automobile | $1,000,000 per occurrence |
| Products Liability | $1,000,000 per occurrence |
| Products Liability | $2,000,000 aggregate |
| Liquor Law Liability | $1,000,000 each common cause |
| Marinas / Marine Operators Legal Liability | $2,000,000 per loss, per accident |
| | Or per occurrence |

PAA                                                1                          Revised 4/10/07

EXHIBIT 1

| | |
|---|---|
| Hull Coverage | $1,000,000 per fleet (Max. $500,000/boat) |
| Protections & Indemnity (includes Jones Act & towing liability) | |
| Limited pollution on Policies | $100,000 per occurrence |

**Property Exposure**
The property limits available in the Marina and boat dealers program would be up to $3,000,000 per location. The limit applies separately to both fixed and floating property (each can have up to $3,000,000 per location). Any limits above *$3,000,000* would require fac reinsurance with a reinsurer acceptable to BUP.

**Commercial Auto**
Combined Single Limit (CSL)                    $1,000,000

AquaPac Millennium Program
The following coverages would be available under the program:

**Casualty Exposure**
Protection and Indemnity including:

| | |
|---|---|
| Longshoremen's and Harbor Workers Compensation* | $500,000 |
| Medical payments | $ 10,000 |
| Under-insured Boats | $100,000 |
| Charterer Liability | $500,000 |

        *No coverage would be available for Jones Act.

**Property Exposure**

| | |
|---|---|
| Hull & Machinery | $250,000 |
| Personal Effects | $ 50,000 |
| Trailers | Stated Amount |
| Commercial Towing | $  1,000 |

E.  Maximum Annual Premium Volume

The maximum premium volume to be written by Administrator for this Agreement on an annual basis is as follows:    $25,000,000

F.  Exclusions

The following is excluded from this Agreement and the policies written by Administrator under this Agreement:  N/A

G.  Rating

Administrator shall only use the rates and underwriting rules approved by the Company and filed with the respective Insurance Department(s) for the Territory noted above, for the authorized lines, if so required.

PAA                                   2                     Revised 4/10/07

EXHIBIT 1                                                              31

H. Forms

Administrator shall only use the policy forms and endorsements approved by the Company and filed with the respective Insurance Department(s) for the Territory noted above, for the authorized lines, if so required. Manuscripted endorsements may be filed and used only with prior approval of Company and regulatory approval, if required.

I. Maximum Policy Period

The maximum policy period to be offered by Administrator is: fifteen (15) Months.

J. Policy Cancellation Provisions

Administrator shall follow the policy cancellation provisions contained within those policy forms and endorsements approved by the Company and filed with the respective Insurance Department(s) for the Territory noted above, for the authorized lines, if so required, or as required otherwise by regulation.

K. Deviations

Any deviations to the above items may be written by Administrator only with the prior written approval of Company.

Agreed and accepted to be effective this 1st day of February, 2008 by:

Agent:                                               Company:

Western Marine Insurance Services, Inc.              Berkley Underwriting Partners, LLC

Signed                                               Signed:
Porus Austin, CFO                                    John Diem, President

PAA                          3                       Revised 4/10/07

EXHIBIT 1                                         32

## EXHIBIT A

### UNDERWRITING AUTHORITY

A. Insurance Companies

StarNet Insurance Company – AquaPac Millennium Program & Commercial Auto (AquaPac Plus Program – only)
Gemini Insurance Company – AquaPac Plus Program

B. Territory

The Administrator's "Territory" shall be defined as follows:
CA, WA, OR, ID, CO, UT, MT, NV, AZ, & NM

The following additional states are available in the AquaPac plus Program:
AR, IL, IN, IA, KY, MI, MN, MO, OH, OK, TN, TX, WI

C. Authorized Lines/Products

The Administrator's "Authorized Lines/Products" for this Agreement are as follows:

Commercial Auto
Inland Marine

D. Limits of Authority

Underwriting Authority is only granted to Joe Cecchini and R.J. Lorenzi on business produced through approved producers. Underwriting Authority is granted to Shelia Eskue for the AquaPac Plus program and to Sherri Garner and Kathy Kennedy for AquaPac Millennium Program.

The Administrator's maximum "Limits of Authority" to be written are as follows:

AquaPac Plus Program
The following limits would apply under this program:

Casualty Exposure
Total policy liability limits of up to $1,000,000/$2,000,000. The following coverages would be available under the program:

| | |
|---|---|
| CG: | $1,000,000 per occurrence |
| Employee Benefit Liability | $1,000,000 per occurrence |
| Fire Legal Liability | $1,000,000 per occurrence |
| Hired and non-owned automobile | $1,000,000 per occurrence |
| Products Liability | $1,000,000 per occurrence |
| Products Liability | $2,000,000 aggregate |
| Liquor Law Liability | $1,000,000 each common cause |
| Marinas / Marine Operators Legal Liability | $2,000,000 per loss, per accident |
| | Or per occurrence |
| Hull Coverage | $1,000,000 per fleet (Max. $500,000/boat) |
| Protections & Indemnity (includes Jones Act | |

PAA                              1                              Revised 4/10/07

EXHIBIT 1                              33

& towing liability)
Limited pollution on Policies                    $100,000 per occurrence

**Property Exposure**
The property limits available in the Marina and boat dealers program would be up to $3,000,000
per location.  The limit applies separately to both fixed and floating property (each can have up to
$3,000,000 per location).  Any limits above *$3,000,000* would require fac reinsurance with a
reinsurer acceptable to BUP.

**Commercial Auto**
Combined Single Limit (CSL)                      $1,000,000

AquaPac Millennium Program
The following coverages would be available under the program:

**Casualty Exposure**
Protection and Indemnity including:
Longshoremen's and Harbor Workers Compensation*      $500,000
Medical payments                                     $ 10,000
Under-insured Boats                                  $100,000
Charterer Liability                                  $500,000
          *No coverage would be available for Jones Act.

**Property Exposure**
Hull & Machinery                                     $250,000
Personal Effects                                     $ 50,000
Trailers                                             Stated Amount
Commercial Towing                                    $   1,000

E.   Maximum Annual Premium Volume

     The maximum premium volume to be written by Administrator for this Agreement on an annual basis
     is as follows:

F.   Exclusions

     The following is excluded from this Agreement and the policies written by Administrator under this
     Agreement:

G.   Rating

     Administrator shall only use the rates and underwriting rules approved by the Company and filed with
     the respective Insurance Department(s) for the Territory noted above, for the authorized lines, if so
     required.

H.   Forms

     Administrator shall only use the policy forms and endorsements approved by the Company and filed
     with the respective Insurance Department(s) for the Territory noted above, for the authorized lines, if

PAA                                 2                        Revised 4/10/07

EXHIBIT 1                                              34

so required. Manuscripted endorsements may be filed and used only with prior approval of Company and regulatory approval, if required.

I. Maximum Policy Period

The maximum policy period to be offered by Administrator is: fifteen (15) Months.

J. Policy Cancellation Provisions

Administrator shall follow the policy cancellation provisions contained within those policy forms and endorsements approved by the Company and filed with the respective Insurance Department(s) for the Territory noted above, for the authorized lines, if so required, or as required otherwise by regulation.

K. Deviations

Any deviations to the above items may be written by Administrator only with the prior written approval of Company.

Agreed and accepted to be effective this 1st day of January, 2007 by:

Agent:                                                Company:

Western Marine Insurance Services, Inc.               StarNet Insurance Company

Signed:                                               Signed:
        Porus Austin, CFO                                     John Diem, President

EXHIBIT 1                                    35

## EXHIBIT A

## UNDERWRITING AUTHORITY

A.  Insurance Companies

StarNet Insurance Company – AquaPac Millennium Program
Gemini Insurance Company – AquaPac Plus Program

B.  Territory
The Administrator's "Territory" shall be defined as follows:

CA, WA, OR, ID, CO. UT, MT, NV, AZ, & NM

C.  Authorized Lines/Products

The Administrator's "Authorized Lines/Products" for this Agreement are as follows:

Commercial Auto
Inland Marine

D.  Limits of Authority

Underwriting Authority is only granted to Ed Bordenave, Joe Cecchini and R. J. Lorenzi on
business produced through approved producers.

The Administrator's maximum "Limits of Authority" to be written are as follows:

AquaPac Plus Program
The following limits would apply under this program:

**Casualty Exposure**
Total policy liability limits of up to $1,000,000/$2,000,000. The following coverages would
be available under the program:

| | |
|---|---|
| CG: | $1,000,000 per occurrence |
| Employee Benefit Liability | $1,000,000 per occurrence |
| Fire Legal Liability | $1,000,000 per occurrence |
| Hired and non-owned automobile | $1,000,000 per occurrence |
| Products Liability | $1,000,000 per occurrence |
| Products Liability | $2,000,000 aggregate |
| Liquor Law Liability | $1,000,000 each common cause |
| Marinas / Marine Operators Legal Liability | $2,000,000 per loss, per accident or per occurrence |
| Hull Coverage | $1,000,000 per fleet (Maximum $500,000 per boat) |
| Protections & Indemnity (includes Jones Act & Towing Liability) | $1,000,000 per occurrence |
| Limited Pollution on Policies | $100,000 per occurrence. |

PAA
Rev 1/5/05                         Page 1 of 4

EXHIBIT 1

36

**Property Exposure**

The property limits available in the marina and boat dealers program would be up to $3,000,000 per location. The limit applies separately to both fixed and floating property (each can have up to $3,000,000 per location). Any limits above $3,000,000 would require fac reinsurance with a reinsurer acceptable to BUP.

**Commercial Auto**

Combined Single Limit (CSL)                               $1,000,000

AquaPac Millennium Program

The following coverages would be available under the program:

**Casualty Exposure**

Protection and Indemnity including

Longshoremen's and Harbor Workers Compensation*          $500,000
Medical Payments                                         $ 10,000
Under-insured Boats                                      $100,000
Charterer Liability                                      $500,000
     *No coverage would be available for Jones Act.

**Property Exposure**

Hull & Machinery                                         $250,000
Personal Effects                                         $ 50,000
Trailer                                                  Stated Amount
Commercial Towing                                        $   1,000

E.   Maximum Annual Premium Volume

The maximum premium volume to be written by Administrator for this Agreement on an annual basis is as follows:

F.   Exclusions

The following is excluded from this Agreement and the policies written by Administrator under this Agreement:

G.   Rating

Administrator shall only use the rates and underwriting rules approved by the Company and filed with the respective Insurance Department(s) for the Territory noted above, for the authorized lines, if so required.

H   Forms

Administrator shall only use the policy forms and endorsements approved by the Company and filed with the respective Insurance Departments(s) for the Territory noted above, for the

PAA
Rev 1/5/05                          Page 2 of 4

EXHIBIT 1                                                           37

authorized lines, if so required. Manu scripted endorsements may be filed and used only with the prior approval of Company and regulatory approval, if required.

I. Maximum Policy Period

The maximum policy period to be offered by Administrator is: Fifteen (15) months.

J. Policy Cancellation Provisions

Administrator shall follow the policy cancellation provisions contained within those policy forms and endorsements approved by the Company and filed with the respective Insurance Department(s) for the Territory noted above, for the authorized lines, if so required, or a required otherwise by regulation.

K. Deviations

Any deviations to the above items may be written by Administrator only with the prior written approval of Company.

PAA
Rev 1/5/05                    Page 3 of 4

EXHIBIT 1                    38

Agreed and accepted to be effective this 1st Day of October 1004 by:

**Agent:**

Western Marine Insurance Services, Inc.

Signed: _____

Name:  Porus Austin, CFO

**Company**

StarNet Insurance

Signed: _____

Name: John Diern, President

PAA
Rev 1/5/05

Page 4 of 4

EXHIBIT 1

39



MURPHY PEARSON
BRADLEY & FEENEY

A Professional Corporation

WWW.MPBF.COM

88 Kearny Street, Suite 1000
San Francisco, CA 94108
Telephone  415-788-1900
Facsimile  415-393-8087

May 7, 2009

**BY FAX AND U.S. MAIL**

Howard Wollitz
CHARLSTON, REVICH & WOLLITZ LLP
1925 Century Park East, Suite 1250
Los Angeles, California 90067

Re:     **Gemini v. Western Marine**
        **Our File No.:  FREE.113615.1**

Dear Mr. Wollitz:

Pursuant to Paragraph 8.2 of the Program Administrator Agreement, Western Marine Insurance Services, Inc., hereby agrees to indemnify, defend, and hold harmless Berkley Underwriting Partners LLC and Gemini Insurance Company in the matter of Wesco Sales v. Gemini Insurance Company and Berkley Insurance Company, Ventura County Superior Court action no. 56-2009-003368-22-CU-IC-VTA.

Western Marine Insurance Services, Inc., reserves the right to withdraw from this agreement to indemnify, defend, and hold harmless if facts are discovered that action no. 56-2009-003368-22-CU-IC-VTA does not give rise to Western Marine's obligations provided in Paragraph 8.2 of the Program Administrator Agreement.

Very truly yours,

Steven A. Kronenberg

SAK.20025000.doc

SAN FRANCISCO              LOS ANGELES              SACRAMENTO

EXHIBIT 2

40