UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEMINI INSURANCE COMPANY, a corporation,<br><br>        Plaintiff,<br><br>      v.<br><br>WESTERN MARINE INSURANCE SERVICES CORPORATION, a California corporation,<br><br>        Defendant. | No.  2:10-cv-03172-KJM-CKD<br><br><br>ORDER |
| AND RELATED THIRD- AND FOURTH-PARTY CLAIMS | |

        This order resolves the motion for summary judgment, or in the alternative, for partial summary judgment (the Motion), brought by plaintiff Gemini Insurance Company (Gemini) against defendant Western Marine Insurance Services Corporation (Western Marine) and Scottsdale Indemnity Company (Scottsdale), the subrogee of Western Marine.  *See generally* Mot., ECF No. 95-1.  Western Marine and Scottsdale each opposed the Motion.  Opp'ns, ECF Nos. 111, 112.  Gemini replied to each separately.  Replies, ECF Nos. 115, 117.  On January 15, 2016, court held a hearing on the motion.  Howard Wollitz appeared for Gemini, Stephen Fleischer-Ihn appeared for Western Marine, and Gary Kull appeared for Scottsdale.

1

1        As explained below, the court GRANTS Gemini's Motion with respect to notice

2  and DENIES the balance of Gemini's Motion.

3  I.        PROCEDURAL HISTORY

4        On November 23, 2010, Gemini filed the original complaint in this action, alleging

5  breach of contract and common law negligence against Western Marine.  In response to the

6  complaint, Western Marine filed an answer and a third-party complaint against third-party

7  defendants Alliant Insurance Services, Inc. (Alliant) and David Cranmer, Wesco's insurance

8  broker.  ECF Nos. 9, 10.  After the court granted its motion to intervene, ECF No. 53, Scottsdale

9  filed an intervenor complaint, as Western Marine's subrogee, against Gemini, Alliant, and MCS,

10 the third-party administrator that adjusted claims for policies issued by Western Marine on behalf

11 of Gemini under a Program Administrator Agreement (PAA).  ECF No. 56.  Western Marine then

12 moved to amend its answer, ECF No. 52, which motion the court denied, Order, ECF No. 65.

13       Subsequently, Gemini filed this motion.  At hearing, the court directed the parties

14 to meet and confer on whether the record should be corrected, and whether or not the parties

15 should be given the opportunity to file supplemental briefing.  ECF No. 123.  The parties

16 stipulated to allow both, ECF No. 125, and Gemini then filed Exhibit 40 to replace Exhibit 13,

17 ECF No. 127.  Western Marine and Scottsdale each filed a supplemental memorandum in

18 response to Exhibit 40.  ECF Nos. 129, 130.  Gemini replied to each brief separately.  ECF

19 Nos. 134, 135.

20 II.       FACTUAL BACKGROUND

21       The facts in this section are undisputed unless specified otherwise.

22       A.        Program Administrator Agreement (PAA)

23       Gemini is an insurer not licensed by the state of California, of a type known as a

24 non-admitted or surplus lines insurance company.  Eskue Dep. 21:1–5, 32:8–14, ECF No. 96;

25 ECF No. 97, Gemini Ex. 7 at 44. [1]  As a surplus lines insurer Gemini cannot directly contact

26 prospective insureds to sell policies in California.  Eskue Dep. 21:10–13.  Western Marine is a

27

28       [1] All references to the record, other than depositions, cite to ECF pagination.

licensed surplus lines broker, specializing in marine insurance; it solicited, underwrote, bound, and issued commercial insurance policies for Gemini to insureds in California under the PAA as an independent contractor.[2]  Western Marine's Resp. to Gemini's Stmt. of Genuine Issues (WMRS) Nos. 1, 4, ECF No. 111-2; Scottsdale's Resp. to Gemini's Stmt. of Undisputed Fact (SUMF) Nos. 1, 4, ECF No. 112-1; PAA at 3, 6, ECF No. 96, Gemini Ex. 1.  As provided by the PAA, Western Marine underwrote and issued policies for Gemini, and had binding authority to do so.  Eskue Dep. 22:20–23:4.  The PAA established Western Marine's duties and liabilities related to underwriting and issuance of Gemini's policy.

The PAA, or the "Agreement," provides that "Company is contracted as the Manager of the insurance companies designated in Exhibit A," which included Gemini, "and therefore has express and implied authority to enter into this contract and perform such duties as required by this contract."  PAA at 2.  Berkley Underwriting Partners, LLC (Berkley) was designated as the "Company" for the purpose of the PAA.  *Id.*  Berkley, as an agent of Gemini, entered into the PAA with Western Marine, designated as the "Administrator" for the purpose of the PAA, effective July 1, 2004.  Order at 6–8.

Under "Appointment/Authority," section 1.2 of the PAA provides:

> Subject to the limitations contained in this Agreement, Administrator shall perform all acts necessary to the proper solicitation, placement, acceptance, and servicing of the policies including:
>
> a. to solicit, underwrite, quote, bind, rate, code, and store policies; and
>
> b. to collect, receive, and account for premiums on policies; and
>
> c. to number, issue, countersign, and deliver policies executed by authorized officers of [Berkley]; and

---

[2] "Independent contractor" and "agent" are not mutually exclusive legal categories.  *APSB Bancorp v. Thornton Grant*, 26 Cal. App. 4th 926, 930 (1994).  An independent contractor is also an agent when it contracts to act on behalf of a principal and is subject to the principal's control except with respect to the agent's physical conduct.  *Id.*  Here, Western Marine is performing Gemini's underwriting services and selling insurance policies to potential insureds in California because Gemini as a surplus lines insurer cannot have direct contact with potential insureds in California.  Thus, for the purpose of underwriting, binding and issuing commercial insurance policies, Western Marine is an agent for Gemini.

> d. to make endorsements, changes, and modifications to policies as authorized by Company; and
>
> e. to effect cancellation and non-renewal of policies . . . [and]
>
> . . .
>
> g. to perform faithfully the duties set forth herein and to provide any other related activities or services incidental or necessary to the complete servicing of policies issued hereunder.

PAA at 2–3.  With respect to the word "underwrite" used in 1.2.a., Sheila Eskue, vice president and underwriting manager of Western Marine, defines underwriting as "assessing a loss, determining the profitability of the risk, to mitigate loss and to be profitable for the company." Eskue Dep. 36:10–12.

Under "General Obligations of Administrator," section 4.3 of the PAA provides that Western Marine shall be responsible for

> full compliance with all applicable laws, regulations, rules, and requirements relating to the performance of its obligations hereunder; and the general standards, rules, and regulations of the insurance industry; and all written instructions provided to Administrator from time to time by Company.

PAA at 5.

Section 10.13 under "General Provisions" further provides, in relevant part, "Administrator shall comply with the requirements of all applicable federal, state and local laws, rules and regulations of all insurance regulatory authorities . . . ."  PAA at 17.

Under "INSURANCE AND INDEMNITY," section 8.2 of the PAA provides, in relevant part:

> At all times hereafter, Administrator agrees to defend, indemnify, and hold Company harmless from and against all claims, actions, causes of action, liability, or loss which result from any real or alleged negligent or willful acts, errors, or omissions of Administrator, or the servants, employees, representatives, producers, or brokers of Administrator in the performance or breach of duties under this Agreement, including but not limited to soliciting, quoting, underwriting, and/or binding policies prohibited under Section 3.1.  [Western Marine] further agrees that in the event [Berkley] is in violation of any state code, statute, regulation, or bulletin due to the negligent or willful acts, errors, or omissions of [Western Marine], or the servants, employees, representatives or producers of Administrator, then Administrator shall assume the

responsibility and liability for such act and shall indemnify and hold Company harmless for such liability and loss. Loss shall include but not be limited to, all damages, costs, expenses, reasonable attorneys' fees and other legal fees, penalties, fines, direct or consequential damages, assessments, verdicts (including punitive damages to the extent permissible by law), and any other expense or expenditure incurred by Company.

This [s]ection . . . shall survive termination of this Agreement.

In all third party liability claims asserted against Company, wherein Administrator shall defend and indemnify Company, Administrator shall notify Company within 24 hours of receipt of such claim. Company shall have the right to retain counsel of its own selection, at Administrator expense, to provide a defense to Company. Company's written consent must be obtained prior to any settlement, which consent will not be unreasonably withheld. If Administrator, within a reasonable time after receiving notice of a claim from Company, fails to defend, Company shall have the right, but not the obligation, to undertake the defense, compromise, or settlement of such claim on behalf of, for the account of and at the risk of Administrator.

PAA at 11.

As noted, Section 3.1 of the PAA, provides, in relevant part:

With respect to the policies which Administrator is now or may in the future be authorized to solicit, transact, quote, underwrite, rate, or bind under this Agreement, Administrator will not solicit, transact, quote, underwrite, rate, or bind policies on the following:

a. risks which are unacceptable in accordance with this Agreement, or the underwriting guidelines, procedures, instructions, or memoranda provided to Administrator by Company from time to time, or in excess of the authority limits, or in violation of any other limitations set out in Exhibit A; or

b. risks which are not in compliance with the applicable forms, rules, rates, or filings of Company according to their exact terms and to the laws and regulations in effect in the Territory.

PAA at 4. "Territory" is defined in Exhibit A to include California. Gemini Ex. 1 at 19.

Section 10.5 of the PAA identifies the "Applicable Law," and states the PAA "shall be [interpreted], governed and enforced by and construed in accordance with the laws of the State of Illinois, without regard to its rules regarding conflict of law." PAA at 16.

5

B. <u>Gemini Policies</u>

Between 2004 and 2007, Western Marine, issued three Gemini policies to Wesco Sales Corporation (Wesco) for five recreational boat marinas in southern California (Marinas). Gemini Ex. 7 at 45; ECF No. 98, Gemini Ex. 10 at 34; ECF No. 99, Gemini Ex. 13 at 3.  The policies were issued through Wesco's retail insurance broker Alliant, specifically David Cranmer, who had experience obtaining insurance for marine operators, and writing policies since 1985. Cranmer Dep. 15:12–18, ECF No. 96, Gemini Ex. 5; Gemini's Resp. to Scottsdale's Counter-Stmt. of Undisputed Facts (SCSF) No. 5.

1. <u>2004–2005 Policy</u>

Wesco's application for a 2004–2005 policy (2004 Application) requested blanket coverage for all five Marinas.  ECF No. 96, Gemini Ex. 4 at 138, 140.  Western Marine contends that "blanket coverage" is not defined in the policy.  WMRS No. 13.  Under Illinois law, undefined contractual terms are typically afforded their plain and ordinary meanings "[u]nless the agreement unequivocally specifies" nuanced connotations, *Frederick v. Prof'l Truck Driver Training Sch., Inc.*, 328 Ill. App. 3d 472 (2002), and words of art or technical terms are assigned their industrial meanings within the commercial context of the agreement, *Archer–Daniels Midland Co. v. Ill. Commerce Comm'n*, 184 Ill. 2d 391 (1998) (noting that Illinois follows the approach described in Restatement (Second) of Contracts § 202(3)(b)).  *See also Prestwick Capital Management, Ltd. v. Peregrine Financial Group, Inc.*, 727 F.3d 646, 656 (7th Cir. 2013). According to Cranmer, blanket insurance or blanket coverage adds the stated values or replacement values for all locations covered under the policy and allows it to be applied to one location.  Cranmer Dep. 20:4–14.  Together, the blanket coverage and replacement values provisions of the 2004–2005 Policy issued based on the Application create coverage for the repair or replacement of the piers, wharves, docks, and floats at any of the five marina locations.  SCSF No. 6.

/////

/////

/////

6

1    One section of the 2004 Application contained the following instruction:

2    ENTER ALL CLAIMS OR LOSSES (REGARDLESS OF FAULT
     AND WHETHER OR NOT INSURED) OR OCCURRENCES
3    THAT MAY GIVE RISE TO CLAIMS FOR THE PRIOR 5
     YEARS . . . .
4

5    Gemini Ex. 4 at 137.  Next to that instruction was a box labeled "CHK HERE IF NONE."  *Id.*

6    Both portions of the Application were left blank.  *See id.*  Towards the end of the Application,

7    Wesco was asked: "DO YOU FEEL THAT THE OPERATIONS, HOUSEKEEPING OR

8    OTHER PHYSICAL CONDITIONS PRESENT AN UNUSUAL EXPOSURE?  IF YES,

9    EXPLAIN."  *Id.* at 155.  In Cranmer's application on behalf of Wesco, he checked the box for

10   "YES" but did not provide an explanation.

11       Western Marine ordinarily followed up if information was missing from an

12   Application.  Eskue Dep. 74:9–24; Petersen Dep. 68:17–21, ECF No. 97, Gemini Ex. 6.

13   However, it issued the 2004–2005 Policy without following up.  WMRS No. 11; SUMF No. 11;

14   Gemini Ex. 7 at 45.

15       The 2004–2005 Policy included blanket coverage for all five Marinas with the

16   term "BLKT" printed on the declarations page of the policy.  Eskue Dep. 84:3–7, 86:14–20,

17   87:22–23; Cranmer Dep. 22:2–10, ECF No. 96, Gemini Ex. 5; Gemini Ex. 7 at 46; Cangemi Dep.

18   83:7–12, ECF No. 98, Gemini Ex. 11.  The notation on the declarations page was the only

19   indication to clarify whether the policy was issued on a blanket limit basis.  SCSF No. 4; *see also*

20   Eskue Dep. 87:2–5.

21       2.    2005–2006 Policy

22       In 2005, Western Marine ceased offering blanket coverage for multiple locations

23   in all of its policies.  Dawson Dep. 133:5–17, ECF No. 97, Gemini Ex. 8.  Also in 2005, Western

24   Marine hired Research Specialists Inc. (RSI) to inspect the docks at 3821 Victoria Avenue, one of

25   the five Marinas at issue in this case.  ECF No. 101, Gemini Ex. 34 at 2.  RSI's inspection report

26   states: "[t]he docks are in good condition with no trip/fall hazards noted," and "[t]he overall

27   condition of the . . . docks . . . is good."  *Id.*  "Good" condition meant the docks were acceptable

28   for underwriting.  Eskue Dep. at 128:11–20, 129:8–11, 130:15–21, 131:3–16.  The report by RSI

7

contrasts with a 2002 report by Index Research Services Inc. (Index Research) sent to Western Marine on the 3821 Victoria Avenue dock and a neighboring dock at 3615 Victoria Avenue (together the "Oxnard Marinas"), which states,

> [T]he docks areas [were] in poor condition.  Some of the boards were very worn and . . . [there were] raised wood and also the plywood was warped in several patched area the boards were up and could present a trip-and-fall hazard . . . .

Gemini Ex. 33 at 58.

Wesco's application for the 2005–2006 Policy (2005 Application) renewed its request for blanket coverage.  Eskue Dep. at 94:15–23; Cranmer Dep. 62:12–17, 67:9–68:23; ECF No. 98, Gemini Ex. 9 at 7.  The 2005 Application also evidences the same omissions as did the 2004 Application with respect to claims or losses for the past five years and any unusual exposures.  Gemini Ex. 9 at 3, 4, 7, 20, 29.  Western Marine never made further inquiries with respect to the omitted information before renewing the policy for 2005 to 2006.  WMRS Nos. 15-16; SUMF No. 15–16; *see also* Cranmer Dep. 55:10–13.  The 2005–2006 Policy did not include blanket coverage for the Marinas.  WMRS No. 16; SUMF No. 16.  Western Marine did not provide any specific notice to Wesco or its broker regarding the lack of blanket coverage. Cranmer Dep. 68:11–23.

### 3.   2006–2007 Policy

As did the 2004 and 2005 Applications, Wesco's application  to renew the 2005–2006 Policy (2006 Application) for the 2006 to 2007 term contained the same blanket-coverage request as before, as well as the same omissions.  ECF No. 98, Gemini Ex. 12 at 183, 184, 187, 197–200.  As before, Western Marine did not make any inquiries into the incomplete answers. Cranmer Dep. 82:24–83:8.  Western Marine renewed the policy for 2006–2007 with no blanket coverage.  WMRS No. 23; SUMF No. 23.  Western Marine did not inform Wesco or its broker that the 2006–2007 Policy, like the 2005–2006 Policy, did not contain blanket coverage.  *Id.*

The 2006–2007 Policy did not specify individualized coverage limits for each of the five Marinas; thus, Western Marine used a statement of values, which stated the values for the individual properties, in its underwriting file as the applicable coverage limits, because the policy

8

1   itself did not provide the limit for claims.  Petersen Dep. 106:4–109:22; Dawson Dep. 39:4–7;

2   Cangemi Dep.117:7–18; *see also* Gemini Ex. 12 at 153.

3           The 2006–2007 Policy excluded coverage of losses or damage from wet or dry rot

4   unless it resulted from fire or lightning, or another "specified cause of loss," with  windstorm

5   qualifying as a "specified cause."   Gemini Ex. 40-2,[3] ECF No. 127-2 at 38.  The 2006–2007

6   Policy also excluded coverage for losses caused by "neglect of the insured to use all reasonable

7   means to save and preserve property from further damage at and after the time of loss," wear and

8   tear, and "rust, corrosion, decay, deterioration, weathering, hidden or latent defect, or any quality

9   in property that causes it to damage or destroy itself . . . ." *Id.* at 38–39.  The relevant exclusions

10  are for:

11          9. "Fungi," Wet Rot, Dry Rot, and Bacteria – Presence, growth,
           proliferation, spread, or any activity of 'fungi,' wet or dry rot, or
12         bacteria.  However if 'fungi,' wet or dry rot, or bacteria results in a
           'specified cause of loss' we will pay for the loss or damage caused
13         by that "specified cause of loss.

14          . . .

15          12. Neglect – Neglect of the insured to use all reasonable means to
           save and preserve property from further damage at and after the
16         time of loss.

17          15. Other Types of Losses:

18          a. Wear and Tear;

19          b. Rust, corrosion, decay, deterioration, weathering, hidden or latent
           defect, or any quality in property that causes it to damage or destroy
20         itself . . . .

21  Gemini Ex. 40-2 at 38–39.

22          C.       The Claim

23          Wesco, through David Cranmer of Alliant, submitted a Property Loss Notice  to

24  Gemini on December 7, 2006 (the First Notice).  SCSF No. 12.  This First Notice stated a date of

25  loss on December 14, 2004, and sought coverage under the 2004–2005 Policy for "wind/storm

26  damage caused to docks" at the Oxnard Marinas.  *Id.*  Gemini directed the claim to Marine

27 ─────────────────

28          [3] Exhibit 40, ECF No. 127, was divided into two parts.  Exhibit 40-1 is part one of the
    exhibit and Exhibit 40-2 is part two.

Claims Services, Inc. (MCS), which acted as Gemini's agent and adjusted the claim.  SCSF No. 13.  MCS assigned the claim to Langhammer & Associates (L&A) for further investigation.  *Id.*  In a letter dated December 13, 2006 from MCS to L&A, MCS noted: (1) discrepancies in the date of loss reported by Wesco, (2) the Notice was late and temporary repairs had been made, and (3) Wesco had advised Alliant of the loss immediately, but Alliant had not reported the loss at that time.  *Id.*

On December 18, 2006, Theodore Brown of L&A interviewed Frank Butler, Wesco's owner and president.  SCSF No. 14.  During the interview, Butler said the docks in question were initially damaged either in January 2003 or 2004 by a major storm, which broke a lot of the main supports.  *Id.*  Butler also told Cranmer that new docks would have to be put in, but did not immediately follow up then.  *Id.*  The docks were not immediately replaced; instead, temporary repairs were made following the loss, which exacerbated the damage to the docks.  *Id.*

On December 20, 2006, Alliant submitted a new Property Loss Notice (the Second Notice) for the Marinas, this time identifying December 10, 2006 as the date of loss.  SCSF No. 15.

On January 5, 2007, Brown made his first report to MCS on Wesco's claim.  SCSF No. 16.  Brown noted the docks had suffered "notable wind damage" at an undetermined date during a prior policy period, and the temporary repairs of placing "plywood over the original decking may have result [sic] in conditions resulting in additional rotting of the docks."  *Id.*  Contrary to Wesco's claims regarding the date of loss, MCS concluded the initial date of loss was January 2001 when the Marinas were insured by another company.  SCSF No. 18.

As a result of the discrepancies and issues raised by MCS, Joseph Pojman, then Senior Vice President of Claims for Berkley, requested the file on Wesco's claim be sent to Howard Wollitz, outside counsel for Gemini and its counsel in this case, for coverage review.  Pojman Dep. at 84:10–12, 155:10–13.  Pojman further requested that Western Marine ask Wollitz to send a reservation-of-rights letter to Wesco, but the letter was never issued.  Pojman Dep. 157:18–161:2.

1    MCS, as Gemini instructed, did send Wesco's file to Wollitz on January 24, 2007

2    for a coverage review.  SCSF No. 20.  MCS identified the following issues for review: (1) late

3    notice of multiple dates of loss, (2) wear and tear as opposed to wind/storm damage, (3) the

4    failure to properly mitigate damage, (4) Wesco's failure to list damage to the docks on its

5    applications for insurance coverage, and (5) an original loss, which occurred prior to the policy

6    period.  Scottsdale Ex. 11, ECF No. 112-1 at 140–43.

7    In February 2007, Wollitz provided his firm's analysis and recommendations

8    regarding Wesco's claim, and concluded the insured had misrepresented its loss history in its

9    insurance applications since 2001.  SCSF No. 21.  He suggested Gemini ask Western Marine

10   about what appeared to be false insurance applications and decide whether the policies should be

11   rescinded.  Scottsdale Ex. 12, ECF No. 112-1 at 147.  Wollitz also suggested Gemini should

12   retain an expert to determine the amount of damage the docks would have suffered from the

13   storms during the policy period had they not suffered previous losses.  *Id.* at 145.  In addition,

14   Wollitz suggested Gemini should

15        [D]isclaim any obligation to pay the cost to repair losses incurred
before the policy or damage caused by wet or dry rot, neglect,

16        consequential loss, wear and tear, decay, deterioration, weathering
hidden or latent defect of any quality in property that causes it to

17        damage or destroy itself, all of which are excluded causes of loss
under the appropriate policy.

18

19   *Id.*  Following Wollitz's sending of his letter, in September 2007, Gemini agreed to pay Wesco's

20   claim up to the individual limits of the liability, although at the time, Wesco demanded blanket

21   coverage.  SCSF No. 23.  Gemini did not raise any of the potential coverage defenses identified

22   by MCS or Wollitz, and made no reservation of rights.  *Id.*  On March 5, 2008, Dennis Keithley

23   with MCS, who adjusted Wesco's claim, sent an email to Wollitz asking whether to initiate

24   litigation to reform the policy at issue.  SCSF No. 24; SUMF No. 27.

25   In February 2009, Wesco filed suit against Gemini in the Underlying Action.

26   Wesco alleged Gemini had breached the insurance contract and its covenant of good faith and fair

27   dealing by paying Wesco's claim based on the limits of coverage per insured location rather than

28   blanket coverage.  WMRS No. 31; SUMF No. 31.  Western Marine's insurer, Scottsdale,

1    defended Gemini at the beginning of the Underlying Action.  WMRS No. 34; SUMF No. 34.  But

2    on August 2, 2010, Scottsdale withdrew its defense of Gemini.  WMRS No. 35; SUMF No. 35.

3    Western Marine did not assume Gemini's defense after Scottsdale's withdrawal.  WMRS No. 36;

4    SUMF No. 36.

5           In September 2010, Wesco accepted $1.9 million in settlement of the Underlying

6    Action, and filed a notice to dismiss the case on August 15, 2012.  WMRS No. 39; SUMF No. 39;

7    *see also Wesco Sales Corporation v. Gemini Ins. Co.*, No. 2009-336822 (Ventura Cty. Cal. Super.

8    Ct.).  Gemini payed $950,000, and Scottsdale payed $950,000 on behalf of Western Marine.  *Id.*

9    III.    LEGAL STANDARD

10          Summary judgment is appropriate where the court is satisfied "that there is no

11   genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

12   Fed. R. Civ. P. 56(a).  The "threshold inquiry" is whether "there are any genuine factual issues

13   that properly can be resolved only by a finder of fact because they may reasonably be resolved in

14   favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  When the

15   court looks at the evidence presented by the parties, "[t]he evidence of the non-movant is to be

16   believed, and all justifiable inferences are to be drawn in . . . [the] [non-movant's] favor."  *Id.*

17   at 255.

18          The moving party bears the initial burden of demonstrating to the court "that there

19   is an absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*,

20   477 U.S. 317, 325 (1986).  Once the moving party satisfies its initial burden, the burden then

21   shifts to the non-moving party, who "must establish that there is a genuine issue of material fact

22   . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).  A fact is

23   "material" when it might affect the outcome of the suit under the applicable substantive law

24   governing the claim.  *Anderson*, 477 U.S. at 248.  A factual dispute is "genuine" where the

25   evidence is such that "a reasonable jury could return a verdict for the non-moving party."  *Id.*  In

26   other words, the non-moving party must "make a showing sufficient to establish the existence of

27   [every] element essential to that party's case, and on which that party will bear the burden of

28   proof at trial."  *Celotex*, 477 U.S. at 322.  "Where the record taken as a whole could not lead a

1   rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

2   *Matsushita*, 475 U.S. at 587 (internal quotations omitted).  Thus, for instance, competent

3   testimony by a single declarant may defeat summary judgment though opposed by many other

4   declarants.  *United States v. 1 Parcel of Real Prop., Lot 4, Block 5 of Eaton Acres*, 904 F.2d 487,

5   491–92 (9th Cir. 1990).

6           In carrying their burdens, both parties must "cit[e] to particular parts of materials

7   in the record . . . ; or show [ ] that the materials cited do not establish the absence or presence of a

8   genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

9   Fed. R. Civ. P. 56(c)(1).  "A genuine issue of material fact does not spring into being simply

10  because a litigant claims that one exists or promises to produce admissible evidence at trial."

11  *Del Carmen Guadalupe v. Agosto*, 299 F.3d 15, 23 (1st Cir. 2002); *see Galen v. County of*

12  *Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007).

13          The court has the discretion in appropriate circumstances to consider materials the

14  parties have not properly brought to its attention, but the court is not required to examine the

15  entire file for evidence establishing a genuine issue of material fact.  *See S. Cal. Gas Co. v. City*

16  *of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d

17  1026, 1031 (9th Cir. 2001).

18  IV.    DISCUSSION

19         A.    Choice-of-Law

20          The court must first determine which state's law  applies to Gemini's claims.  As

21  noted, the PAA includes a choice-of-law provision identifying Illinois law.  PAA at 16.  This

22  court previously has reviewed the choice-of-law rules that apply to its determination of whether

23  this provision is valid and applicable here:

24              When a federal court sits in diversity, it must look to the forum
                state's [California] choice of law rules to determine the controlling
25              substantive law."  *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002).
                When parties to a contract bargain for an explicit choice of law
26              provision, courts applying California's choice-of-law rules  are
                guided by the California Supreme Court's decision in *Nedlloyd*
27

28

                                                    13

1

2

*Lines B.V. v. Superior Court*, 3 Cal. 4th 459 [ ] (1992)." *Nuvo Research Inc. v. McGrath*, C 11-4006, 2012 WL 1965870, at *3 (N.D. Cal. 2012).

3

Order at 4.

4

Under California law, the scope of a contract's choice-of-law clause is determined

5

by the body of law identified in the agreement, unless the agreement specifies a different scope.

6

*Washington Mutual Bank, FA v. Superior Court*, 24 Cal. 4th 906, 916 n.3 (2001); *see also*

7

*Batchelder v. Kawamoto*, 147 F.3d 915, 918 n.2 (9th Cir. 1998).  California courts broadly

8

construe a contractual choice-of-law provision, particularly when two sophisticated commercial

9

parties agree to such a clause.  As a general rule, the parties' choice will apply to all claims

10

arising from or related to the contract, including tortious breaches of duties emanating from the

11

agreement or the legal relationships it creates.  *Nedlloyd Lines B.V.*, 3 Cal. 4th at 464.

12

Here, the choice-of-law clause in the PAA looks to Illinois as the governing law

13

for the contract's interpretation: "[t]his [PAA] shall be  [interpreted], governed and enforced by

14

and construed in accordance with the laws of the State of Illinois, without regard to its rules

15

regarding conflict of laws."  PAA at 16.  Thus, as the breach of contract claim is related to the

16

contract, it is governed by Illinois law.  As for the negligence claim, the complaint alleges

17

Western Marine negligently performed its duties under the PAA.  Compl. ¶¶ 25–29.  Therefore,

18

the negligence claim, though a tort claim, is based on alleged breaches of duties arising from the

19

PAA and the legal relationships created by the PAA, and the choice-of-law provision governs the

20

negligence claim as well.  *See Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025, 1051–52

21

(N.D. Cal. 2013) (plaintiffs' tort claims were subject to the choice-of-law provision).

22

The court first considers the contract claim.

23

B.     Breach of Contract Claim

24

Under Illinois law, a breach of contract is shown by the following elements: (1) a

25

valid and enforceable contract exists; (2) plaintiff's performance; (3) defendant's breach of the

26

contract; and (4) plaintiff's injury resulting from the breach.  *Burrell v. City of Mattoon*, 378 F.3d

27

642, 651 (7th Cir. 2004).  Here, the parties dispute only the third element.  Gemini argues

28

Western Marine breached the PAA when it failed to (1) provide specific notice to Wesco Sales or

1   its insurance broker that the renewal policies lacked blanket coverage, (2) provide a defense to

2   Gemini after Scottsdale ceased its defense, and (3) reimburse Gemini for the settlement amount it

3   paid out to Wesco Sales and defense costs Gemini paid after Scottsdale withdrew.  *See generally*

4   Mot.

5          In response Western Marine contends it did not breach the contract because (1) it

6   provided sufficient notice, (2) Gemini was not listed as an indemnified party in the PAA, and

7   (3) Gemini was negligent.  *See generally* Western Marine Opp'n.  Scottsdale similarly contends:

8   (1) Gemini was not an indemnified party under the PAA; (2) PAA only provided indemnification

9   for Western Marine's negligence, and Gemini has not demonstrated Western Marine breached

10  any duty of care arising from the PAA; and (3) Gemini improperly paid the claim.  *See generally*

11  Scottsdale Opp'n.

12         The parties' arguments can be broadly divided into the following categories:

13  (1) whether Gemini was an indemnified party under the PAA; (2) whether Western Marine

14  needed to notify Wesco or its insurance broker regarding the lack of blanket coverage in the later

15  policies; and (3) whether Gemini was negligent.

16                      1.      Indemnified Party

17         Indemnity agreements are strictly construed, and any ambiguity in the agreement

18  is to be construed against the indemnitee, because "an agreement to indemnify a party for its own

19  negligence is so unusual and extraordinary, the intent to indemnify to that extent must be beyond

20  doubt by express stipulation."  *Blackshare v. Banfield*, 367 Ill. App. 3d 1077, 1079–80 (2006)

21  (citing *Westinghouse Electric Elevator Co. v. LaSalle Monroe Building Corp.*, 395 Ill. 429, 434–

22  35 (1946)).  Western Marine contends because the indemnification provision of the PAA does not

23  list Gemini as a party, Gemini is not entitled to indemnification.  The court finds Western

24  Marine's argument unpersuasive, as explained below.

25         Illinois courts have held that where an agent discloses the name of his principal or

26  where the party dealing with the agent knows that the agent is acting as an agent, the agent is not

27  personally liable on a contract unless he so agrees.  *Water Tower Realty Co. v. Fordham 25 E.*

28  *Superior, L.L.C.*, 404 Ill. App. 3d 658, 667 (2010); *Dunlop v. McAtee*, 31 Ill. App. 3d 56, 59–60

1   (1975). The PAA states "Company is contracted as the Manager of the insurance companies

2   designated in Exhibit A," which listed Gemini, "and therefore Company has express and implied

3   authority to enter into this contract and perform such duties as required by this contract." PAA at

4   2. Berkley was designated as the "Company" for the purpose of the PAA. *Id.* Gemini does not

5   dispute this reading of this provision, and the court has previously held the terms of the PAA

6   establish Berkley as plaintiff's agent. Order at 7. Simply because the PAA does not directly

7   name Gemini as an indemnified party does not necessarily preclude it as one. It would be

8   inconsistent for Gemini, the principal, to be legally bound by all other parts of the agreement and

9   not the indemnification provision.

10         This conclusion does not deviate from Illinois law, which provides that "indemnity

11   agreements must be set forth in clear and explicit language, so that the indemnitor's obligations

12   are manifest," *Taracorp, Inc. v. Industries, Inc.*, 73 F.3d 738, 743–44 (7th Cir. 1996). First, the

13   PAA provides that Berkley entered into the agreement as an agent of Gemini. Second, as stated

14   in the court's previous order, Gemini was the actual provider of the insurance policies in dispute,

15   and the transactions between Berkley and Western Marine directly relate to Gemini, a fact

16   Western Marine was aware of through its issuing numerous policies for Gemini. Order at 8.

17   Western Marine was thus properly put on notice and the record shows it was aware of its

18   obligations as an indemnitor.

19         Accordingly, the court finds Gemini is a party to the indemnification provision.

20         2.    Notice

21         Section 4.3 of the PAA provides that Western Marine is required to comply with

22   all applicable laws, regulations, rules, and requirements in the performance of its obligations

23   under the agreement. PAA at 5. Its obligations include underwriting and issuing policies, *id.* at

24   2–3, and neither party disputes that Western Marine was required to comply with California law

25   when it underwrote and issued policies to Wesco. The parties, however, dispute whether Western

26   Marine was required to give Wesco or its broker notice when, after the 2004–2005 Policy

27   expired, the 2005–2006 and 2006–2007 Policies no longer included blanket coverage.

28

Under California law, insurance companies are generally bound by the greater coverage provided by an earlier policy when the insured is not notified of a specific reduction in coverage under a renewal policy.  *Metropolitan Business Management, Inc. v. Allstate Ins. Co.*, 448 Fed. Appx. 677, 678 (9th Cir. 2011) (citing *Allstate Ins. Co. v. Fibus*, 855 F.2d 660, 663 (9th Cir. 1988)).  The California Supreme Court has held that in cases of standard insurance contracts, made between parties of unequal bargaining strength, exceptions and limitations on coverage limitations must be called to the insured's attention clearly and plainly.  *Steven v. Fidelity & Casualty Co.*, 58 Cal. 2d 862, 879 (1962).  California courts "have long been disinclined to effectuate clauses of limitation of liability which are unclear, unexpected, inconspicuous or unconscionable."  *Id.*  As the state Supreme Court explained,

> It must be presumed, ordinarily, that persons are familiar with the terms of written contracts to which they are parties, and in the absence of fraud they are justly bound by the provisions therein, but the rule should not be strictly applied to insurance policies.  It is a matter almost of common knowledge that a very small percentage of policy holders are actually cognizant of the provisions of their policies and many of them are ignorant of the names of the companies issuing the said policies.  The policies are prepared by the experts of the companies, they are highly technical in their phrase[o]logy, they are complicated and voluminous . . . .

*Raulet v. Northwestern etc. Ins. Co.*, 157 Cal. 213, 298 (1910).  *Raulet*, however, addresses the case of an individual lay consumer and not a business entity or an expert well versed in insurance policies.

Here, Wesco acquired all three policies through Alliant, an insurance broker.  This is not a case where the insurance policies or contracts were made between parties of unequal bargaining strength, where one party is unfamiliar with the provisions of an insurance policy or its technical vocabulary.  Cranmer, Wesco's insurance broker from Alliant, had experience obtaining insurance for marine operators, and he had been writing marine insurance since 1985.  Cranmer Dep. 15:12–18.  Cranmer cannot reasonably be compared to a lay policy holder without knowledge of how an insurance policy works.  The cases Gemini cites to reach the opposite conclusion are unhelpful as they pertain to interactions directly between an insurer and its insured, a relationship of unequal bargaining strength.  *See, e.g.*, *Davis v. United Services Auto.*

17

1    *Ass'n*, 223 Cal. App. 3d 1322, 1325 (1990) (homeowners dealing directly with the insurer);

2    *Fields v. Blue Shield of Cal.*, 163 Cal. App. 3d 570, 575–78 (1985) (physician-psychiatrist suing

3    insurer directly for insurer's refusal to pay for medical treatment); *Fibus*, 855 F.2d at 661–63

4    (automobile insurer brought declaratory judgment against individual insured to determine

5    coverage); *Sorensen v. Farmers Ins. Exch.*, 56 Cal. App. 3d 328, 330–34 (1976) (individual

6    insured brought suit against automobile liability insurer for coverage benefit).  A case cited by

7    Western Marine, *Rios v. Scottsdale Ins. Co.*, 119 Cal. App. 4th 1020 (2004), is similarly

8    unpersuasive.  At issue there was whether the insured's agent's mistaken representation with

9    respect to the policy could have been imputed to the insurer or the surplus lines broker.  *Id.* at

10   1026.  Here, the issue is not whether Cranmer failed to request blanket coverage for Wesco.  The

11   application requested blanket coverage; however, Western Marine did not expressly advise him

12   that the renewed policies were without blanket coverage.  *See supra*, p. 8.

13           A more comparable case is *Business to Business Markets, Inc. v. Zurich*

14   *Specialties (B2B)*, 135 Cal. App. 4th 165, 172 (2005).  There, the California Court of Appeal

15   examined whether a surplus lines insurance broker, such as Western Marine here, can be liable to

16   an intended beneficiary of a contract.  *Id.* at 167.  The third party contacted a retail insurance

17   broker and informed him of the insured's insurance needs, namely errors and omissions insurance

18   for the insured, an Indian company, to compensate the third party if the insured failed to deliver

19   the promised software.  *Id.*  The retail insurance broker then contacted the surplus lines insurance

20   broker to place the insurance policy.  *Id.*  The surplus lines insurance broker placed the policy

21   with the insurer.  *Id.*  When the insured failed to deliver the software, the insurer refused to pay

22   based on the policy's exclusion for work done in India.  *Id.*  The California Court of Appeal

23   found that a surplus lines insurance broker is a "professional entity rendering specialized

24   services."  *Id.* at 171.  "As such, clients and others rely on the broker to get the right type of

25   policy."  *Id.* at 172.  A surplus lines insurance broker is thus well positioned to prevent injuries,

26   even those suffered by a third party, from an insured's inadequate insurance coverage.  *Id.*

27   Western Marine is a licensed surplus lines broker, specializing in marine insurance; it solicited,

28   underwrote, bound, and issued commercial insurance policies for Gemini to insureds in California

1  under the PAA as an independent contractor.  As did the surplus lines insurance broker in *B2B*,

2  Western Marine provides a "specialized, niche-market service" and was positioned to prevent

3  injuries such as those suffered by Gemini when Wesco was provided with inadequate insurance

4  coverage.  Wesco, through Cranmer, requested blanket coverage in its insurance applications.

5  Western Marine should have provided notice to Wesco when it declined to provide blanket

6  coverage subsequent to the 2004-2005 Policy.  Simply providing an insurance policy omitting  a

7  blanket coverage provision does not provide notice.

8            Western Marine also argues California Insurance Code section 678.1(c) codifies

9  the above common law insurer's duty to give notice of an elimination of coverage and says the

10  statute provides an exception for surplus lines insurers such as Gemini.  Opp'n at 10.  Section

11  678.1(c) states:

12            An insurer, at least 60 days, but not more than 120 days, in advance
             of the end of the policy period, shall give notice of nonrenewal, and

13            the reasons for the nonrenewal, if the insurer intends not to renew
             the policy, or to condition renewal upon reduction of limits,

14            elimination of coverages, increase in deductibles, or increase of
             more than 25 percent in the rate upon which the premium is based.

15

16  Cal. Ins. Code § 678.1(c).  The statutory provision does not directly codify the common law duty

17  for insurers to give notice of elimination of coverage.  The language provides a narrower set of

18  situations in which an insurer is required to give notice.  However, regardless of whether the

19  statute codifies the duty at issue, the section is inapplicable here as surplus lines insurance is

20  exempt from the notice requirement and nothing in the record shows either party contemplated

21  nonrenewal, or issued the renewal policies based on any conditions.  *Id.* §§ 675.5(d)(7), 678.1(a).

22            Accordingly, Western Marine had a duty to provide notice to Wesco that the

23  renewed policies, contrary to the assumptions made in submission of the renewal applications, did

24  not contain blanket coverage.  Gemini's motion for summary judgment based on lack of notice is

25  GRANTED in this respect.  The court finds it unnecessary to consider the kind of notice required,

26  because the record reflects Western Marine provided no notice.

27

28

1          3.      Negligence of the Indemnitee

2          For an indemnity provision to extend to indemnification of the indemnitee's own

3    negligence, the extended coverage must be clear and explicit.  *Blackshare*, 367 Ill. App. 3d at

4    1079.  "If that language is not present, indemnification will be limited to the liability arising out

5    of the indemnitor's negligence only."  *Id.*  Here, there is no language in the PAA requiring

6    Western Marine to indemnify Gemini for its own negligence.  The issue for this court to resolve

7    is thus whether the Underlying Action arose out of Gemini's or Western Marine's negligence.

8    Specifically, Gemini and Western Marine dispute which of them was negligent in not adhering to

9    the relevant California insurance laws during the events leading up to the Underlying Action and

10   the Underlying Action itself.  The court analyzes this dispute by first discussing the

11   misrepresentations in the applications and rescission before moving on to whether Gemini was

12   negligent.

13          a)      Misrepresentation in the Applications and Rescission

14          First, Gemini argues Western Marine should have made inquiries when Wesco

15   returned the applications incomplete.  In response, Western Marine contends it justifiably relied

16   on the representations of Cranmer, as Wesco's insurance broker with Alliant.  Western Marine

17   further argues information acquired when MCS adjusted the claim provided sufficient evidence

18   for rescission, but Gemini chose not to rescind.  Lastly, Western Marine argues Gemini failed to

19   properly investigate and rely on its defenses in the Underlying Action.  The court first addresses

20   the applications and whether Gemini should have rescinded.

21          Courts have applied California Insurance Code sections 331 and 359 to permit

22   rescission of an insurance policy based on an insured's negligent or inadvertent failure to disclose

23   a material fact in the application for insurance.  *Mitchell v. United Nat. Ins. Co.*, 127 Cal. App.

24   4th 457, 469 (2005) (collecting cases).  The materiality of a misrepresentation is determined by its

25   probable and reasonable effect upon the insurer's or its agent's underwriting decision.  Cal. Ins.

26   Code § 334 ("Materiality is to be determined not by the event, but solely by the probable and

27   reasonable influence of the facts upon the party to whom the communication is due, in forming

28   his estimate of the disadvantages of the proposed contract, or in making his inquiries."); *Douglas*

1    *v. Fidelity Nat'l Ins. Co.*, 229 Cal. App. 4th 392 (2014).  Specifically, the test for materiality is

2    whether the information would have caused the underwriter to reject the application, charge a

3    higher premium, or amend the policy terms, had the underwriter known the true facts.  *Mitchell*,

4    127 Cal. App. 4th at 469.  This is a subjective test, and whether the information would have

5    affected the underwriter depends on the underwriter involved.  *See id.*  Courts are divided as to

6    whether the issue of a misrepresentation's materiality in an insurance application is a question of

7    fact or law.  Certain courts have found the materiality issue to be one of law merely because an

8    insurer "has demanded answers to specific questions in an application for insurance."  *Imperial*

9    *Casualty & Indemnity Co. v. Sogomonian*, 198 Cal. App. 3d 169, 179 (1988).  In *Mitchell*,

10   however, the court stated that "[i]t seems unreasonable to conclude that an incorrect answer to

11   any question on an insurance application automatically would constitute a material

12   misrepresentation."  *Id.* at 475.  Different factual situations may determine whether a

13   misrepresentation is material.  The court finds this line of reasoning persuasive given the

14   subjective nature of the test, and agrees that in certain cases, the issue of materiality may be a

15   factual one.  *See id.*  However, as the court in *Mitchell* found, a trial court may properly grant

16   summary judgment for the insurer and the movant, where a reasonable trier of fact could not find

17   that the representations were immaterial, and where the evidence of materiality is not

18   contradicted.  127 Cal. App. 4th at 475.  Lastly, while an insurer may have the right to rescind if

19   the insured made a material misrepresentation, the right may be waived when an insurer, or in this

20   case, the underwriter "neglect[s] to make inquiries as to [material] facts, where they are distinctly

21   implied in other facts of which information is communicated."  *Old Line Life Ins. Co. v. Superior*

22   *Court*, 229 Cal. App. 3d 1600, 1606 (1991) (citing Cal. Ins. Code § 336(b)).[5]

23            Here, the information, or lack thereof, relates to two particular sections of the

24   applications.  One section asked Wesco to enter all claims or losses that may give rise to claims

25   for the prior five years.  Gemini Ex. 4 at 137.  Wesco did not provide an answer.  In another

26   _____

27   [5] California Insurance Code section 336 provides:  "The right to information of material
     facts may be waived, either by (a) the terms of insurance or (b) by neglect to make inquiries as to
     such facts, where they are distinctly implied in other facts of which information is
28   communicated."

section, Wesco was asked if any conditions presented an unusual exposure, and if yes, to explain. Gemini Ex. 4 at 155.  Wesco answered "yes" but did not provide an explanation.  Gemini argues Western Marine should have inquired further upon receiving the incomplete applications, and because it did not do so, it prevented Gemini from seeking a rescission later on.  Mot. at 7. Western Marine, in return, contends Gemini should have rescinded the 2006–2007 Policy based on the incomplete applications and later acquired evidence, which showed Wesco suffered damages to the docks long before submitting its claim and had made repairs that exacerbated the docks' deterioration.  Western Marine Opp'n at 15.

(1)      Prior Damages or Losses

Omission of the fact that the docks had suffered prior damage or losses qualifies as a material misrepresentation on Wesco's application.  The omission would have affected whether Western Marine rejected the application, charged a higher premium or amended the policy, because prior losses or damage would change the condition of the insured property as a policy condition.  The change in condition would likely increase the risk of future loss because a previously damaged dock would be more susceptible to future weather events or deterioration in general.  This increased risk could not have been contemplated by Western Marine or Gemini when they insured the marinas.  *See Clayburgh v. Agricultural Ins. Co. of Watertown, N.Y.*, 155 Cal. 708, 711 (1909) ("The insurer seeks to guard itself against liability in the event that the condition of the insured property should so change that the risk upon such property in its altered condition would presumably not have been assumed for the premium paid.").

However, under California law, Western Marine had no duty to inquire as to the truth of representations of fact made by the insured or its agent in an application.  *Mirich v. Underwriters at Lloyd's London*, 64 Cal. App. 2d 522, 531 (1944).  A duty to inquire may arise when the insurer or its agent, in this case Western Marine, becomes aware of facts that would bring those representations under suspicion, and cause a prudent person to make inquiries. *Mirich*, 64 Cal. App. 2d at 531.  Wesco's failure to respond to questions about prior losses in the applications does not automatically imply there were prior losses.  *See Colony Ins. Co. v. Crusader Ins. Co.*, 188 Cal. App. 4th 743, 753–54 (2010) ("An insurer waives information about

a material fact where it neglects to make inquiry about material facts distinctly implied from other facts that had been revealed." (citation omitted)). Nevertheless, the reports from MCS and the report from L&A to MCS both showed Wesco's applications were inconsistent with respect to dates of loss and damage. The effect of the temporary repairs disclosed by Wesco should also have placed Gemini on alert for possible misrepresentations by Wesco. Scottsdale Exs. 7, 9.

Western Marine's lack of inquiry did not waive Gemini's right to rescission. Gemini still had the right to rescind when later information revealed prior damage and losses up until the commencement of the Underlying Action. *Cole v. Calaway*, 140 Cal. App. 2d 340, 347-48 (1956) (under California law, rescission must occur before an action on the policy and within a reasonable time from discovering an error in the policy; citing to Cal. Civ. Code § 1691 ("to effect a rescission a party to the contract must, promptly upon discovering the facts which entitle him to rescind") and Cal. Ins. Code § 650 ("Whenever a right to rescind a contract of insurance is given to the insurer by any provision of this part such right may be exercised at any time previous to the commencement of an action on the contract.")). Though Pojman and Wollitz contemplated drafting a letter confirming the right to rescind, the actual rescission never occurred.

(2)    Unusual Exposure

In terms of the question regarding unusual exposure, Wesco answered in the positive but failed to provide the required explanation. First, the question is whether the omitted explanation was material. Would a lack of explanation as to what or how conditions presented unusual exposure have caused Western Marine to reject Wesco's application, charge a higher premium, or amend the policy terms, had Western Marine known the true facts? Unusual exposure with respect to the policies at issue would change the condition of the docks, is a critical component of the insured property at issue. Unusual exposure would increase the likelihood the docks would suffer damage in the event of a storm or require temporary remedies that could accelerate deterioration of the docks in the event of further damage in the future. Such a clarification of the condition of the insured property would cause Western Marine to reject the application, charge a higher premium, or amend the policy term because it would increase the risk

in a manner Western Marine and Gemini did not assume for the premium paid.  *See Clayburgh*, 155 Cal. at 711.

Given that this omission is material, the second question is whether the right to rescission was waived because Western Marine did not inquire further.  As noted above, Western Marine had no generalized duty to inquire.  *Mirich*, 64 Cal. App. 2d at 531.  But here, Wesco's answer of "YES" should have alerted Western Marine of facts potentially material to the issuance or renewal, in this case, of a policy.  Even though the positive answer did not explicitly disclose the docks suffered major changes to their condition, the answer nevertheless should have prompted Western Marine to ask for an explanation because it implied changes to the docks' condition.  *See Colony Ins. Co.*, 188 Cal. App. 4th at 753–54.  Western Marine had a duty to inquire when Wesco did not provide an explanation as requested.  Western Marine's neglect to inquire waived Gemini's right to rescission.  Thus, Gemini could not have rescinded on this ground.

In sum, though Wesco's lack of explanation regarding unusual exposure prevented rescission by Gemini, there remains a genuine dispute of material fact as to Gemini's negligence in failing to rescind the policy with respect to prior damage and loss.  The court need not reach the question whether Gemini was negligent in the litigation of the Underlying Action.

b)     <u>Wesco's Insurance Policies</u>

The court next looks at whether Gemini was negligent with respect to the relevant insurance policy at issue, here the 2006–2007 Policy.  Both parties agree California law applies to Gemini's conduct.

(1)     Ambiguous Policy Forms

Western Marine contends Gemini implied, in its motion, the language in the policy was too ambiguous to determine whether blanket coverage and the amount of coverage for each of Wesco's docks were provided in the 2006–2007 Policy.  Western Marine Opp'n at 14.  Gemini replies it never made such an argument, ECF No. 115 at 7, and the court agrees with Gemini.

A policy provision is ambiguous when it is susceptible to two or more reasonable constructions, *E.M.M.I. Inc. v. Zurich American Ins. Co.*, 32 Cal. 4th 465, 470 (2004) (citation

omitted), and Western Marine points to no language in the 2006–2007 Policy that could be interpreted in more than one way.  Rather, as noted above, the issue here is whether Western Marine should have provided clear notice to Wesco when it did not continue blanket coverage for policies after the 2004–2005 period.  With respect to Gemini's argument that Western Marine should have provided clear notice to signal the 2005–2006 and 2006–2007 Policies no longer provided blanket coverage, the court has found a notice requirement above.

(2)   Exclusions

The court turns next to whether Wesco's claim should have been excluded.  Under California law, exclusionary clauses are strictly construed against the insurer and in favor of the insured.  *N. American Bldg. Maint., Inc. v. Fireman's Fund Ins. Co.*, 137 Cal. App. 4th 627, 642 (2006).  Any provision that takes away or limits coverage reasonably expected by the insured must be "conspicuous, plain and clear" to be enforceable.  *Id.* (citations and internal quotations omitted).

Western Marine argues the 2006–2007 Policy contains specific exclusions that applied to Wesco's claim.  ECF No. 129 at 1.  However, Gemini did not properly exclude Wesco's claim.  *Id.* at 1–2.  Scottsdale similarly argues Gemini waived the coverage defenses available under the exclusions without justification and paid Wesco's claim.  *See generally* ECF No. 130.  In reply, Gemini argues the exclusions did not apply.  ECF Nos. 134, 135.

The 2006–2007 Policy provides that "Gemini" will pay for loss of or damage to [c]overed [p]roperty . . . directly caused or resulting from any Covered Causes of Loss occurring during the policy period."  ECF No. 127-2, Gemini Ex. 40 at 36.  Covered Causes of Loss does not include losses included in the exclusions.  *Id.*  As noted above, the relevant exclusions are as follows:

> 9. "Fungi," Wet Rot, Dry Rot, and Bacteria – Presence, growth, proliferation, spread, or any activity of 'fungi,' wet or dry rot, or bacteria.  However if 'fungi,' wet or dry rot, or bacteria results in a 'specified cause of loss' we will pay for the loss or damage caused by that "specified cause of loss."
>
> . . .

12. Neglect – Neglect of the insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

15. Other Types of Losses:

a. Wear and Tear;

b. Rust, corrosion, decay, deterioration, weathering, hidden or latent defect, or any quality in property that causes it to damage or destroy itself . . . .

Gemini Ex. 40-2 at 38–39.  Gemini argues the rot was caused by windstorm, which as noted above is a "specified cause of loss."  *Id.* at 38.

Here, the original loss to the docks occurred in January 2001.  SCSF No. 18.  A 2002 report, prepared not by Western Marine or Gemini but by Index Research and sent to Western Marine, showed the docks were in poor condition.  Nevertheless, the 2005 report provided by RSI for Western Marine described the docks at 3821 Victoria Avenue as being in good condition, although photographs showed plywood repairs.  Gemini Ex. 33 at 58; Gemini Ex. 34 at 2; Scottsdale Ex. 11 at 140–41; Scottsdale Ex. 12 at 146.  The later investigation by MCS and L&A in 2006 and 2007 showed the plywood repairs made after January 2001 caused the docks to rot.  Scottsdale Ex. 12 at 141.  The investigation by MCS and subsequent reports show the rot was not caused by the windstorm, which would have allowed the damage by the rot to fall within the exception to the exclusions, as Gemini asserted in its Reply.  ECF No. 135 at 3.  Thus, at least part of the damage and loss reported in Wesco's claim fell under the rot exclusion. Similarly, damage and losses resulting from Wesco's neglect in failing to properly repair the docks after the 2001 loss, to avoid the rot, also should be excluded.  Lastly, damage and loss caused by normal wear and tear, as pointed out by MCS, and the additional deterioration resulting from the temporary plywood repairs should have been excluded as well.  Scottsdale Ex. 11 at 140–41.  At the same time, the record before the court does not contain sufficient undisputed facts to determine whether the entire claim should have been excluded.

Accordingly, the court DENIES Gemini's motion for summary judgment on its breach of contract claim.

C.    Negligence Claim

In its negligence claim, Gemini alleges Western Marine breached its duties under the PAA.  Compl. ¶¶ 27–29.  This claim requires the court to consider the "economic loss rule." As stated above, Illinois law applies here because Gemini alleges Western Marine negligently performed its duties under the PAA.  Compl. ¶¶ 25–29.  Therefore, the negligence claim is a tort claim based on alleged breaches of duties arising from the PAA and the legal relationships created by the PAA.  *See Cannon*, 917 F. Supp. 2d at 1051–52.

Illinois courts have consistently adhered to the "economic loss rule": where the relationship between the parties was governed by contract, a party cannot recover under a tort theory for solely economic losses.  *Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69, 81 (1982). The rule is based on the theory that parties to a contract have already allocated their risk through agreement and thus do not need tort law to protect their rights.  *Mars, Inc. v. Heritage Builders of Effingham, Inc.*, 327 Ill. App. 3d 346, 351 (2002).  Under Illinois law, "economic loss" is defined as "damages for inadequate value, costs of repair, and replacement of the defective product, or consequent loss of profits without any claim of personal injury or damage to other property." *Id.* at 350–51 (citing *Moorman*, 91 Ill. 2d at 81).  Although *Moorman* and *Heritage Builders* both involved a case of product liability, the Illinois Supreme Court applies the economic loss rule to claims to contract for services as well.  *Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 115 Ill. 2d 146, 153 (1986) (plaintiff seeking to recover purely economic losses due to defeated expectations of commercial bargain cannot recover in tort, regardless of plaintiff's inability to recover in contract).

The economic loss rule has three exceptions.  A plaintiff may recover economic damages in tort when (1) the plaintiff has sustained a personal injury or property damage as a result of a sudden or dangerous occurrence; (2) the plaintiff's damages are proximately caused by the defendant's intentional, false misrepresentation; or (3) the plaintiff's damages are proximately caused by the negligent misrepresentation of a defendant in the business of supplying information for the guidance of others in their business transactions.  *Heritage Builders*, 327 Ill. App. 3d at 351–52.

1         Here, Gemini alleges Western Marine had a duty to perform its obligations under

2    the PAA with reasonable care, and to follow applicable law, but Western Marine breached that

3    duty on several occasions.  Compl. ¶¶ 27, 28.  Gemini alleges Western Marine's negligent

4    conduct "caused Gemini to be damaged in the amount of $978,000 . . . ."  Compl. ¶ 29; Mot. at

5    11.  The duties Western Marine allegedly performed negligently arose out of its contractual

6    relationship with Gemini governed by the PAA.  Similar to the plaintiff in *Anderson Electric*,

7    Gemini is seeking to recover a purely economic loss.  Gemini's claim does not fall into any of the

8    three exceptions to the economic loss rule.  Gemini has not suffered a personal injury or property

9    damage as a result of a sudden or dangerous occurrence, and Gemini has not shown

10   misrepresentation on the part of Western Marine, whether intentional or negligent.  *Heritage*

11   *Builders*, 327 Ill. App. 3d at 351–52.  When pressed at hearing, Gemini did not provide any

12   argument or authority to show why its negligence claim is not barred by the economic loss rule.

13        On this record, given the absence of any disputed issue of material fact, the court

14   GRANTS summary judgment for Western Marine on Gemini's negligence claim.  *See Gospel*

15   *Missions of America v. City of Los Angeles*, 328 F.3d 548, 553 (9th Cir. 2003) ("Even when there

16   has been no cross-motion for summary judgment, a district court may enter summary judgment

17   sua sponte against a moving party if the losing party has had a 'full and fair opportunity to

18   ventilate the issues involved in the matter.'"  (quotation omitted)).

19   V.    <u>PARTIAL SUMMARY JUDGMENT</u>

20        Gemini has requested that should the court deny its motion for summary judgment,

21   the court grant its motion for partial judgment.

22        Motions for partial summary judgment may be useful to narrow disputes before

23   trial, eliminate claims or defenses, or otherwise streamline a case.  *See, e.g.*, *Bruschini v. Board of*

24   *Educ.*, 911 F. Supp. 104, 106 (S.D.N.Y. 1995).  The Supreme Court has recognized their utility in

25   this respect: "Summary judgment procedure is properly regarded not as a disfavored procedural

26   shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to

27   secure the just, speedy and inexpensive determination of every action."  *Celotex*, 477 U.S. at 327

28   (citing Fed. R. Civ. P. 1); *see also* 10A Charles A. Wright, et al., Federal Practice & Procedure

1   § 2712 (3d ed. 1998).  And Rule 56 expressly allows district courts the authority to grant

2   summary judgment on "each claim or defense—or the part of each claim or defense—on which

3   judgment is sought."  Fed. R. Civ. P. 56(a).

4         Courts occasionally decline to address motions for partial summary judgment

5   when adjudicating the motion would waste resources rather than preserve them.  *See, e.g.*,

6   *Anselmo v. Mull*, No. 12-1422, 2013 WL 3941779, at *2 (E.D. Cal. July 30, 2013).  As another

7   judge of this court has noted, "piecemeal resolution" of a case by partial summary judgment often

8   "makes trial more difficult and complex as opposed to streamlined."  *Chiron Corp. v. Genentech,*

9   *Inc.*, 268 F. Supp. 2d 1139, 1148 n.6 (E.D. Cal. 2002).  Moreover, the Supreme Court has taken

10  care to note that district courts should act "with caution in granting summary judgment," and that

11  courts have authority "to deny summary judgment in a case where there is reason to believe the

12  better course would be to proceed to a full trial."  *Anderson*, 477 U.S. at 255; *accord Lind v.*

13  *United Parcel Serv., Inc.*, 254 F.3d 1281, 1285 (11th Cir. 2001); *United States v. Honeywell Int'l,*

14  *Inc.*, 542 F. Supp. 2d 1188, 1203 (E.D. Cal. 2008).

15        Gemini identifies twenty separate portions of its breach of contract claim in its

16  request for partial summary judgment.  Mot. at 17–20.  The court finds granting its motion here, if

17  justified, would result in a "piecemeal resolution."  Accordingly, the court DENIES Gemini's

18  motion for partial summary judgment insofar as aspects of the motion have not been addressed

19  above.

20  VI.   <u>DECLARATION OF UNDISPUTED FACTS</u>

21        Gemini also asks in the alternative that the court issue an order establishing as

22  undisputed the contents of its Statement of Undisputed Facts.  Mot. at 23; ECF No. 95-5.

23  Western Marine and Scottsdale, despite not directly opposing the request, have provided

24  substantial citations to the record to dispute the facts provided by Gemini.

25        As provided by Federal Rule of Civil Procedure 56(g), if the court declines to

26  grant the relief requested by a motion for summary judgment, "it may enter an order stating any

27  material fact—including an item of damages or other relief—that is not genuinely in dispute and

28  treating the fact as established in the case."  The moving party bears the initial burden of

1  demonstrating the absence of a genuine issue of material fact.  *Devereaux v. Abbey*, 263 F.3d

2  1070, 1076 (9th Cir. 2001) (citing *Celotex Corp.*, 477 U.S. at 323).

3     The advisory committee's comment to Rule 56(g) provides the following

4  guidance, which echoes the rationale for denying partial summary judgment in the appropriate

5  cases:

6     If it is readily apparent that the court cannot grant all the relief
   requested by the motion, it may properly decide that the cost of
7     determining whether some potential fact disputes may be
   eliminated by summary disposition is greater than the cost of
8     resolving those disputes by other means, including trial.  Even if the
   court believes that a fact is not genuinely in dispute it may refrain
9     from ordering that the fact be treated as established.  The court may
   conclude that it is better to leave open for trial facts and issues that
10     may be better illuminated by the trial of related facts that must be
   tried in any event.

11

12  Fed. R. Civ. P. 56(g) advisory committee's note to 2010 amendment.

13     The court denies the alternative relief requested in Gemini's motion.  The court

14  finds that while certain facts appear to not be genuinely in dispute, the court's determining as

15  much will hamper trial and the triers of fact, as the complex issues and arguments in a case such

16  as this require a full context.  The parties will, of course, be given an opportunity identify

17  disputed and undisputed factual matter in their joint pretrial statement.

18  VII. CONCLUSION

19     Accordingly, the court GRANTS Gemini's motion with respect to notice and

20  DENIES the balance of Gemini's motion for summary judgment and partial summary judgment

21  on its breach of contract claim.  The court DENIES Gemini's request for the court to enter an

22  order establishing certain facts as undisputed.  The court GRANTS summary judgment in favor of

23  Western Marine on Gemini's negligence claim.

24     IT IS SO ORDERED.

25   DATED:  June 21, 2016.

26

27              _____
            UNITED STATES DISTRICT JUDGE

28